(Nos. 71753, 71761 cons.—

OUTBOARD MARINE CORPORATION, Appellant and Cross-Appellee, v. LIBERTY MUTUAL INSUR- ANCE COMPANY *et al.* (Liberty Mutual Insurance Company, Appellee and Cross-Appellant).

*Opinion filed December 4, 1992.—Rehearing denied February 1, 1993.*

94

MILLER, C.J., joined by HEIPLE, J., concurring in part and dissenting in part.

Louis W. Brydges, Sr., and Leslie A. Peterson, of Brydges, Riseborough, Morris, Franke & Miller, of Waukegan, Thomas W. Johnson, Jr., and Michael G. Ermer, of Irell & Manella, of Newport Beach, California, and Richard Kissel, of Gardner, Carton & Douglas, of Chicago, for appellant and cross-appellee Outboard Marine Corporation.

James P. Whitters III, Kim V. Marrkand, Anthony A. Bongiorno and Jeffrey W. Kobrick, of Gaston & Snow, of Boston, Massachusetts, and Paul S. Chervin and Linda E. Spring, of Wildman, Harrold, Allen & Dixon, of Waukegan, for appellee and cross-appellant Liberty Mutual Insurance Co.

Jay V. Krafsur and Jeffrey L. Kaser, of Rivkin, Radler & Kremer, of Chicago, for appellee Commercial Union Insurance Co.

Margaret J. Orbon, of Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago, and Paul R. Koepff, John L. Altieri, Jr., and Aaron F. Fishbein, of Mudge, Rose, Guthrie, Alexander & Ferdon, of New York, New York, for appellee Insurance Company of North America.

Mary Beth Denefe, Audrey S. Hanrahan and Eileen N. Miller, of Haskell & Perrin, of Chicago, and Lorraine

M. Armenti and Gary S. Kull, of McElroy, Deutsch & Mulvaney, of Morristown, New Jewsey, for appellee International Insurance Co.

Gleason, McGuire & Shreffler, of Chicago (Philip J. McGuire and Charles L. Philbrick, of counsel), for appellee Northbrook Insurance Co.

Robert A. Creamer, John S. Vishneski III, Michael J. Hughes and Todd G. Zimmerman, of Keck, Mahin & Cate, of Chicago, for *amicus curiae* Rust-oleum Corporation.

James T. Price, Stephanie A. Mathews and Thomas J. Wilcox, of Spencer, Fane, Britt & Browne, of Kansas City, Missouri, and Kevin M. Forde and Katrina Veerhusen, of Chicago, for *amici curiae* Illinois Manufacturers' Association *et al.*

Robert L. Graham, John H. Mathias, Jr., Barry Sullivan, Thomas C. Buchele and John D. Schugrue, of Jenner & Block, of Chicago, for *amici curiae* Peoples Gas Light & Coke Co. *et al.*

Thomas W. Brunner, Robert B. Bell and Stephen D. Goldman, of Wiley, Rein & Fielding, of Washington, D.C., and Terry Rose Saunders, of Susman, Saunders & Buehler, of Chicago, for *amicus curiae* Insurance Environmental Litigation Association.

Lord, Bissell & Brook, of Chicago (John B. Haarlow, Stephen M. Murray, Daniel I. Schlessinger and Diane I. Jennings, of counsel), and Peterson & Ross, of Chicago (Richard L. Blatt, Larry R. Eaton and Brian A. Frankl, of counsel), for *amicus curiae* John Richard Ludbrook Youell.

Terry Rose Saunders, of Susman, Saunders & Buehler, of Chicago, for *amici curiae* Bituminous Casu-

alty Corporation *et al.* and *amici curiae* Western States Insurance Co. *et al.*

Martha Churchill, of Chicago, and Eugene R. Anderson, Jordan S. Stanzler and Michael R. Magaril, of Anderson, Kill, Olick & Oshinsky, PC, of New York, New York, for *amicus curiae* Mid-America Legal Foundation.

Patrick E. Maloney, of Tressler, Soderstrom, Maloney & Priess, of Chicago, for *amici curiae* Lumbermens Mutual Casualty Co. *et al.*

JUSTICE BILANDIC delivered the opinion of the court:

This consolidated appeal involves a coverage dispute between the plaintiff-insured, Outboard Marine Corporation (OMC), and its primary and excess insurance carriers, Liberty Mutual Insurance Company (Liberty Mutual), Commercial Union Insurance Company (Commercial Union), Insurance Company of North America (INA), International Insurance Company (International), and Northbrook Insurance Company (Northbrook). The coverage dispute between the parties originated when the United States Environmental Protection Agency (EPA) and the State of Illinois (collectively, governmental agencies) brought separate actions against OMC, both seeking redress from OMC for the discharge of polychlorinated byphenyls (PCBs) into the North Ditch, Waukegan Harbor, and Lake Michigan (underlying actions). OMC tendered the defense of the underlying actions to its insurers pursuant to comprehensive general liability (CGL) insurance policies which OMC had purchased from the insurers. The insurers, however, refused to defend OMC, alleging that the underlying actions were not covered under the CGL policies. As a result, OMC was forced to defend itself against the governmental agencies' complaints, incurring substantial de-

fense costs. OMC eventually negotiated and entered into a consent decree with the governmental agencies under the terms of which OMC was required to make payments into a trust fund for the costs associated with the cleanup of these bodies of water.

Due to its insurers' refusal to defend it, OMC instituted this declaratory judgment action against its insurers in the circuit court of Lake County seeking: (1) a declaration that its primary insurers had a duty to defend OMC in the underlying actions; (2) reimbursement from these insurers of the costs it incurred in defending itself against the underlying actions; (3) a declaration that all of its insurers have a duty to indemnify OMC; (4) indemnity with respect to all sums it is required to pay because of property damage to the bodies of water; and (5) its costs and attorney fees for the declaratory action presently before us. Several *amici curiae* have submitted briefs in support of the parties before us. This court has received briefs in support of OMC from *amici* Rust-Oleum Corporation, Peoples Gas, Light & Coke Company, Illinois Manufacturers' Association, and Mid-America Legal Foundation. We have also received *amicus* briefs in support of the insurers from, among others, Insurance Environmental Litigation Association, John Richard Youell, Bituminous Casualty Insurance Company, Lumbermens Mutual Casualty Company, Western States Insurance Company, and Transamerica Insurance Company. We note at this juncture that OMC is only seeking coverage from its insurers for the contamination of Waukegan Harbor and Lake Michigan. OMC has assumed complete liability for the contamination of the North Ditch. Therefore, our discussion will entail only the alleged contamination of Waukegan Harbor and Lake Michigan: the contamination for which OMC now seeks coverage.

After initiating this declaratory action, OMC moved for partial summary judgment against Liberty Mutual, Commercial Union, and INA, its primary insurers, on the issue of their duty to defend OMC in the underlying actions brought by the governmental agencies. OMC contended that these actions were "suits seeking damages" within the coverage language of the CGL policies issued by these insurers. Liberty Mutual, Commercial Union, and INA cross-moved for summary judgment on this duty to defend issue, asserting that the underlying actions were not "suits seeking damages" because they prayed for equitable relief rather than compensatory damages.

Additionally, each defendant insurance company moved for full summary judgment as to its duties to defend and indemnify OMC. The defendants argued that coverage was clearly barred by the "pollution exclusion" provisions of their respective CGL policies. Alternatively, the defendant insurance carriers contended that the underlying actions were "known risks" to OMC at the time that their respective policies commenced and, therefore, were not covered by their policies.

The circuit court granted OMC's motion for partial summary judgment on the "damages" issue against Liberty Mutual. In ruling on this motion, the circuit court found that the technical difference between equity and law was outdated and that the term "damages" was ambiguous. Therefore, the circuit court strictly construed this term against the insurers and in favor of coverage. In addition, the circuit court granted all insurers' motions for summary judgment based on their respective policies' "pollution exclusion" provisions. The circuit court also granted INA's motion for summary judgment on the basis of the "known risk" doctrine but denied the other insurers' motions based on this principle.

The parties appealed the circuit court's summary judgment rulings which were adverse to them. Liberty Mutual appealed the circuit court's ruling in favor of OMC on the "suits seeking damages" issue. OMC appealed the circuit court's rulings in favor of the defendant-insurers based on their respective policies' "pollution exclusion" provisions. In addition, OMC and Commercial Union appealed the circuit court's rulings regarding the "known risk" doctrine.

The appellate court consolidated the appeals and affirmed the circuit court's ruling granting OMC's motion for partial summary judgment against Liberty Mutual on the "suits seeking damages" issue. (212 Ill. App. 3d 231, 238-43.) It also affirmed the circuit court's grant of the insurers' motions for summary judgment premised on their "pollution exclusion" provisions. (212 Ill. App. 3d at 243-49.) The appellate court, however, did not consider the propriety of the circuit court's rulings regarding the "known risk" principle. 212 Ill. App. 3d at 251.

We allowed Liberty Mutual's petition for leave to appeal. (134 Ill. 2d R. 315.) Before this court, Liberty Mutual appeals from the appellate court's ruling that the underlying actions constitute "suits seeking damages" within the language of its CGL policies, thereby triggering Liberty Mutual's duty to defend OMC.

We also allowed OMC's petition for leave to appeal. (134 Ill. 2d R. 315.) OMC contests the appellate court's holding that the "pollution exclusion" provisions of the defendants' respective CGL policies apply to the facts alleged in the underlying actions, thereby negating any coverage which may have otherwise arisen.

Additionally, all parties urge this court to address the circuit court's rulings regarding the "known risk" principle.

## OPINION

Initially, we note that the procedural posture of each contested ruling was either the grant or denial of a motion for summary judgment. In appeals from summary judgment rulings, we conduct a *de novo* review. (See *Schmolke v. Highland Butterfield, Inc.* (1984), 128 Ill. App. 3d 710, 712-13; *Fuller v. Justice* (1983), 117 Ill. App. 3d 933, 938.) Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240.) Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt. (*Purtill*, 111 Ill. 2d at 240.) Where a reasonable person could draw divergent inferences from undisputed facts, summary judgment should be denied. *Pyne v. Witmer* (1989), 129 Ill. 2d 351, 358.

### I.

### KNOWN LOSS

The appellate court failed to consider the circuit court's rulings on INA and Commercial Union's motions for summary judgment based on the known loss doctrine. (This principle has been referred to as "known risk," "loss in progress," and "known loss." Because we feel that "known loss" most adequately describes the doctrine, we will refer to it as known loss.) In addition, no party has petitioned this court for leave to appeal this issue. However, both the insurers and OMC have made reference to these rulings in their briefs, requesting various forms of relief from this court, as they are entitled to do pursuant to Supreme Court Rule 318. (134 Ill. 2d R. 318 (any co-party may seek any relief warranted by the record without filing a separate petition for leave to

appeal or a separate appeal).) Therefore, in the interest of judicial economy, we will consider the circuit court's rulings on the known loss doctrine.

By its very nature, insurance is fundamentally based on *contingent risks* which may or may not occur. (See *Bartholomew v. Appalachian Insurance Co.* (1st Cir. 1981), 655 F.2d 27, 29 (insurer insures against a risk, not a certainty); *Keene Corp. v. Insurance Co. of North America* (D.C. Cir. 1981), 667 F.2d 1034, 1041 (insurance contract is based on uncertain loss or the possibility of incurring legal liability).) One dictionary defines "insurance" as "[a] contract whereby one undertakes to indemnify another against loss, damage, or liability arising from an *unknown or contingent event* and is applicable only to *some contingency or act to occur in [the] future*." (Emphasis added.) (Black's Law Dictionary 721 (5th ed. 1979).) If the insured knows or has reason to know, when it purchases a CGL policy, that there is a substantial probability that it will suffer or has already suffered a loss, the risk ceases to be contingent and becomes a probable or known loss. (See *Prudential—LMI Commercial Insurance v. Superior Court* (1990), 51 Cal. 3d 674, 699, 798 P.2d 1230, 1246-47, 274 Cal. Rptr. 387, 403-04.) Where the insured has evidence of a probable loss when it purchases a CGL policy, the loss is uninsurable under that policy (unless the parties otherwise contract) because the "risk of liability is no longer unknown." (*Appalachian Insurance Co. v. Liberty Mutual Insurance Co.* (3d Cir. 1982), 676 F.2d 56, 63; *Summers v. Harris* (5th Cir. 1978), 573 F.2d 869, 872 (homeowner cannot insure against flood damage when flood waters already flooding front yard); *Prudential—LMI Commercial Insurance v. Superior Court* (1990), 51 Cal. 3d 674, 695 & n.7, 798 P.2d 1230, 1243-44 & n.7, 274 Cal. Rptr. 387, 400-01 & n.7; *cf. Keene Corp.*, 667 F.2d at 1044, 1048. But see *City of Johnstown, New York v. Bankers Stand-*

*ard Insurance Co.* (2d Cir. 1989), 877 F.2d 1146, 1153.)
Therefore, the insurer has no duty to defend or indem-
nify the insured with respect to the known loss *ab initio*,
unless the parties intended the known loss to be covered.
(See *Prudential—LMI*, 51 Cal. 3d at 699, 798 P.2d at
1246-47, 274 Cal. Rptr. at 403-04; *Vyn v. Northwest Ca-
sualty Co.* (1956), 47 Cal. 2d 89, 92-93, 301 P.2d 869,
871; 6B J. Appleman & J. Appleman, Insurance Law &
Practice §4265, at 97 (1979).) In the instant case, the in-
surers contend that the PCB contamination which occa-
sioned the underlying actions constitutes a known loss
because, they assert, OMC knew it was releasing waste
material into the environment as early as 1959.

There is no bright-line test to determine whether and
at what point in time the insured knew or had reason to
know of the substantial probability of the loss at issue.
The extent of the insured's knowledge of the loss must
be determined on a case-by-case basis. In a motion for
summary judgment, the court must determine whether
any factual questions exist with respect to the insured's
knowledge at the time it bought each policy. If the court
finds that no fact questions exist in this regard, the issue
is one of law for the court to decide. As with all appeals
from summary judgment, we review *de novo* the circuit
court's rulings on the insurers' motions for summary
judgment based on known loss.

In the case at bar, the circuit court determined that,
upon receipt of an administrative order from the EPA in
February 1976, OMC had knowledge as a matter of law
that it would suffer a probable loss due to PCB contami-
nation of Waukegan Harbor and Lake Michigan. The ad-
ministrative order provided, in relevant part:

> "The discharge of PCB's by [OMC] *** *presents an immi-
> nent and substantial danger* to the health and welfare of
> persons living adjacent to and utilizing the waters of
> Lake Michigan and threatens the livelihood of persons

utilizing the waters of Lake Michigan for commercial and non-commercial fishing or other aquacultural and agricultural purposes." (Emphasis added.)

The circuit court found that, as a matter of law, any policy issued after OMC's receipt of the February 1976 administrative order would not provide coverage for the PCB contamination of Waukegan Harbor and Lake Michigan. Since INA's policy commenced in March 1976, the circuit court granted its motion for summary judgment on the basis of the known loss doctrine. However, the circuit court denied the other insurers' motions on the known loss principle because it found that disputed issues of fact existed with respect to their respective policies.

Before this court, the insurers argue that, although the circuit court properly granted INA's motion for summary judgment based on the known loss doctrine, it erroneously denied the others' motions. These parties contend that the circuit court should have found, as a matter of law, that OMC should have known that it would suffer a probable loss for polluting Waukegan Harbor and Lake Michigan much earlier in time than when it received the EPA's administrative order in February 1976. In support of their argument, the insurers point to various documents which reveal that OMC had knowledge that it was discharging waste effluent into Waukegan Harbor prior to the issuance of the EPA's February 1976 order.

OMC argues, on the other hand, that it cannot be said as a matter of law that it knew or had reason to know that there was a substantial probability that it would suffer a loss due to PCB contamination of Waukegan Harbor prior to August 1976. On this date, OMC received a letter from the EPA *actually confirming* that the North Ditch and Waukegan Harbor sediments were severely contaminated by PCBs from OMC's facility.

OMC contends that, prior to August 1976, whenever it became aware of the *possibility* that it may have been discharging any pollutants into Waukegan Harbor, it took steps to divert and remedy any such problem so that a loss or liability would not arise. OMC also argues that, during the time period in question, the Illinois Environmental Protection Agency was publicly commending OMC for its diligence in complying with environmental regulations. OMC asserts that, even if it had knowledge of a risk of liability prior to August 1976, this knowledge cannot be equated with knowledge of a probable loss.

After careful review of the record before us, we conclude that the circuit court properly found, as a matter of law, that the February 1976 administrative order from the EPA gave OMC knowledge of a substantial probability that claims would be made against it for PCB pollution of Waukegan Harbor and Lake Michigan. We, therefore, affirm the circuit court's grant of INA's motion for summary judgment based on the known loss doctrine since its policy commenced in March 1976. Based on this doctrine, we find that INA had no duty to defend or indemnify OMC against the underlying actions.

We further conclude that the circuit court properly determined that material questions of fact existed with respect to OMC's level of knowledge at the time that it purchased CGL policies from the other defendants, whose policy periods predated the receipt of the February 1976 order. Because disputed factual questions exist concerning OMC's knowledge at the time it purchased these other policies which cannot be determined summarily, we affirm the circuit court's denial of the other defendant insurers' motions for summary judgment on known loss grounds.

We remand this portion of the case to the circuit court to resolve the factual issues surrounding the level

of OMC's knowledge at the relevant times and to determine whether known loss principles apply to any other carriers. We note on remand that the insurers need not prove that OMC knew or had reason to know of the exact nature and extent of the PCB loss or that the PCB loss or liability was certain to occur, as OMC appears to argue. (But *cf. Aetna Casualty & Surety Co. v. Condict* (S.D. Miss. 1976), 417 F. Supp. 63, 73.) Rather, the known loss doctrine may be invoked if the insurers demonstrate that OMC knew or had reason to know, at the time it purchased the CGL policy, that there was a substantial probability that loss or liability would ensue due to the PCB contamination for which it is seeking coverage. The question is not whether OMC knew it was discharging a pollutant into the environment, as the insurers and their *amici* argue. Rather, the relevant question is whether OMC knew or had reason to know that a probable loss or liability would occur due to the PCB contamination alleged in the underlying complaints. Whether the insured knew it was polluting the environment is more appropriately addressed when addressing the "occurrence" or "pollution exclusion" provisions in CGL policies. See *City of Johnstown, New York v. Bankers Standard Insurance Co.* (2d Cir. 1989), 877 F.2d 1146.

## II.

### "SUITS SEEKING DAMAGES"

We turn now to Liberty Mutual's appeal. Liberty Mutual contends that it is not obligated to defend OMC against the underlying actions brought by the governmental agencies under the terms of its CGL policies. To determine whether the insurer has a duty to defend the insured, the court must look to the allegations in the underlying complaint and compare these allegations to

the relevant provisions of the insurance policy. (See, *e.g.,* *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.* (1991), 144 Ill. 2d 64, 73; *Conway v. Country Casualty Insurance Co.* (1982), 92 Ill. 2d 388, 393.) If the facts alleged in the underlying complaint fall within, or potentially within, the policy's coverage, the insurer's duty to defend arises. (See, *e.g., Wilkin,* 144 Ill. 2d at 73; *Weiss v. Bituminous Casualty Corp.* (1974), 59 Ill. 2d 165, 169.) Refusal to defend is unjustifiable unless it is clear from the face of the underlying complaint that the facts alleged do not fall potentially within the policy's coverage. See, *e.g., Wilkin,* 144 Ill. 2d at 73; *Conway,* 92 Ill. 2d at 393.

The construction of an insurance policy's provisions is a question of law. (See, *e.g., Maryland Casualty Co. v. Chicago & North Western Transportation Co.* (1984), 126 Ill. App. 3d 150, 155; *Rivota v. Kaplan* (1977), 49 Ill. App. 3d 910, 914.) In construing an insurance policy, the court must ascertain the intent of the parties to the contract. (See, *e.g., International Minerals & Chemical Corp. v. Liberty Mutual Insurance Co.* (1988), 168 Ill. App. 3d 361, 370; *Rivota,* 49 Ill. App. 3d at 915.) To ascertain the meaning of the policy's words and the intent of the parties, the court must construe the policy as a whole (see, *e.g., Zurich Insurance Co. v. Raymark Industries, Inc.* (1987), 118 Ill. 2d 23, 50; *Western Casualty & Surety Co. v. Brochu* (1985), 105 Ill. 2d 486, 493), with due regard to the risk undertaken, the subject matter that is insured and the purposes of the entire contract (see *Dora Township v. Indiana Insurance Co.* (1980), 78 Ill. 2d 376, 378). If the words in the policy are unambiguous, a court must afford them their *plain, ordinary, and popular meaning.* (See, *e.g., Wilkin,* 144 Ill. 2d at 74; *Weiss,* 59 Ill. 2d at 170-71.) However, if the words in the policy are susceptible to more than one reasonable interpretation, they are ambiguous (*Wilkin,* 144

Ill. 2d at 74) and will be construed in favor of the insured and against the insurer who drafted the policy (see, *e.g., Wilkin*, 144 Ill. 2d at 74; *Brochu*, 105 Ill. 2d at 495; *Dora Township*, 78 Ill. 2d at 379).

In this case, each CGL policy issued by Liberty Mutual and purchased by OMC contained, in relevant part, the following provision:

> "[Liberty Mutual] will pay on behalf of the insured all sums which the insured shall become obligated to pay as damages because of *** property damage to which this policy applies, caused by an occurrence, and the company shall have the right and duty to defend any suits against the insured seeking damages on account of such property damage ***." .

In this appeal, Liberty Mutual argues that the appellate court erroneously determined that the word "damages" is ambiguous. Liberty Mutual asserts that "damages" has a technical, accepted meaning and the phrase "suits seeking damages" provides coverage only for "actions at law" which seek compensatory, legal damages. Liberty Mutual contends that this phrase is unambiguous and cannot be construed to include coverage for suits seeking equitable or injunctive relief. Therefore, Liberty Mutual contends that the appellate court erroneously held that Liberty Mutual had a duty to defend OMC in the underlying actions.

The question presented before this court is whether the underlying actions, which seek primarily equitable relief, fall potentially within the coverage afforded by Liberty Mutual's CGL insurance policies for "suits seeking damages," thereby triggering Liberty Mutual's duty to defend OMC. Before resolving this issue, it is necessary to set forth some of the facts underlying the instant litigation.

OMC is a large manufacturer of outboard motors. Since the 1940s, OMC has operated a die-casting facility

in Waukegan, Illinois, near Waukegan Harbor. From approximately 1959 to 1972, OMC used a hydraulic fluid, Pydraul, in its die-casting process. Pydraul was manufactured by Monsanto Company (Monsanto) and contained PCBs. During the die-casting process, OMC frequently experienced heavy leaks and spills of Pydraul which it routed through its wastewater collection system. This PCB-laden effluent from OMC's facility was routed to a ditch on OMC's property known as the North Ditch and eventually found its way into Waukegan Harbor and Lake Michigan.

This declaratory judgment action involves several underlying actions. In March 1978, the EPA filed one of the underlying actions at issue in the instant case against OMC in the United States District Court for the Northern District of Illinois. In this complaint, the EPA alleged that, from 1959 until 1972, OMC had discharged PCBs into the North Ditch, Waukegan Harbor, and Lake Michigan, severely contaminating the bottom sediments of these bodies of water. The complaint alleged that, because OMC was not authorized by permit to discharge PCBs into these bodies of water, OMC's conduct violated the Rivers and Harbors Act of 1899 (33 U.S.C. §407 (1988)) and the Federal Water Pollution Control Act (33 U.S.C. §1311(a) (1988)). The agency sought injunctions enjoining OMC from further contaminating these bodies of water and requiring OMC to: (1) dredge the North Ditch; (2) undertake an expedited study on the safest method for removal and disposal of the contaminated sediments of Waukegan Harbor; and (3) remove and dispose of these sediments. In addition, the EPA prayed for the assessment of civil penalties against OMC and the costs of the action.

In August 1978, the State of Illinois also filed a complaint against OMC in the same Federal district court. Containing basically the same factual allegations as the

EPA complaint, the State's complaint alleged that OMC's conduct violated the Federal Water Pollution Control Act, the Illinois public nuisance act (Ill. Rev. Stat. 1977, ch. 100½, par. 26 *et seq.*), the Illinois Environmental Protection Act (Ill. Rev. Stat. 1977, ch. 111½, par. 1001 *et seq.*), the Federal and State common law of nuisance, and the State common law of trespass. Like the EPA, the State requested the district court to enter injunctions enjoining OMC from engaging in any future PCB discharge and requiring OMC to: (1) conduct a study of methods to dredge, remove, and dispose of the contaminated sediments and (2) to remove and dispose of the contaminated sediments from these bodies of water as well as the contaminated soil on its own land. The State also requested that the district court impose civil penalties and the costs of the litigation on OMC.

In November 1978, OMC filed a third-party complaint against Monsanto, the manufacturer of Pydraul, in the EPA action. The EPA then amended its complaint to join Monsanto as a party-defendant in its action against OMC. In September 1980, Monsanto filed a cross-claim against OMC praying for indemnification and/or contribution from OMC for any liability it might incur as a result of the EPA action. In January 1982, the EPA filed a second-amended complaint which added counts against OMC and Monsanto for violations of section 106(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) (42 U.S.C. §9606(a) (1988)). The EPA also prayed for additional injunctive relief requiring OMC and Monsanto to construct a bypass of the North Ditch and an alternative piping system and to install groundwater purge wells and a treatment system to remove PCBs from the groundwater underneath OMC's property. In February 1985, the governmental agencies moved for voluntary dismissal, which the district court granted without prejudice. Both agencies re-

served their right to response costs under section 107(a)(4)(A) of CERCLA (42 U.S.C. §9607(a)(4)(A) (1988)).

In October 1988, the EPA filed a new complaint against OMC in the United States District Court for the Northern District of Illinois which contained factual allegations similar to those made in its initial complaint. On the same day, the State of Illinois also filed a new complaint against OMC which was similar to its initial complaint. Both of these complaints prayed for response costs and damages for injuries to natural resources pursuant to section 107 of CERCLA (42 U.S.C. §9607 (1988)). In April 1989, the district court approved of and entered a consent decree which was negotiated and entered into by OMC, the EPA, and the State of Illinois. Pursuant to the consent decree, OMC was required to make payments into a trust fund for the costs associated with the cleanup of the North Ditch, Waukegan Harbor, and Lake Michigan.

Liberty Mutual initially asserts that the governmental agencies' 1988 complaints are not involved in this appeal and cannot be considered in determining whether the insurers had a duty to defend OMC. However, it is clear from the record that the 1988 complaints were before the trial court when it ruled on OMC's motion for partial summary judgment and are, therefore, part of the record on appeal. The 1988 complaints are the only complaints which specifically pray for response costs and *damages* pursuant to section 107 of CERCLA. Therefore, these 1988 complaints clearly constitute "suits seeking damages." Accordingly, with respect to these 1988 complaints, we hold that, absent an applicable policy exclusion, Liberty Mutual had a duty to defend OMC and we affirm the appellate court in this regard.

However, our determination does not necessarily dispose of the issue of whether Liberty Mutual had a duty

to defend OMC against the underlying complaints which were voluntarily dismissed prior to the filing of the 1988 complaints. Unlike the 1988 complaints, these prior complaints prayed solely for "equitable relief" in the form of mandatory injunctions, the assessment of civil penalties, and the costs of the litigation.

Liberty Mutual contends that, since these pre-1988 complaints did not pray for relief in the form of monetary damages paid to an injured third party as compensation for its injury, its policies provided no coverage for these underlying actions. In support of its argument, Liberty Mutual relies primarily on *Ladd Construction Co. v. Insurance Co. of North America* (1979), 73 Ill. App. 3d 43, wherein the *Ladd* court, addressing a similar argument, interpreted the word "damages" to mean compensatory, legal damages. Therefore, the *Ladd* court found that, since the underlying complaint prayed only for equitable relief, there was no coverage under the CGL policy and the insurer had no duty to defend its insured.

In the case at bar, however, both the circuit and the appellate courts declined to follow *Ladd*. Instead, both of these courts relied on *United States Fidelity & Guaranty Co. v. Specialty Coatings Co.* (1989), 180 Ill. App. 3d 378. The appellate court found that the term "damages" was ambiguous, that numerous jurisdictions have rejected the outdated distinction between equity and law, and that insureds have a right to rely on their commonsense interpretation of the word "damages." Therefore, the appellate court construed the term "damages" to include the insured's cost of complying with mandatory injunctions and held that the CGL policies at issue provided coverage for the underlying complaints, thereby triggering Liberty Mutual's duty to defend OMC. (212 Ill. App. 3d at 238-43; see *Specialty Coatings Co.*, 180

Ill. App. 3d at 390-92.) Although we affirm the holding of the appellate court, we do so on different grounds.

We begin our analysis by noting that this issue has been litigated nationwide in both Federal and State courts. Some courts have determined that the word "damages" in similar CGL policies is ambiguous and have construed it in favor of the insured. (See, *e.g., Hays v. Mobil Oil Corp.* (1st Cir. 1991), 930 F.2d 96, 100-01; *AIU Insurance Co. v. Superior Court* (1990), 51 Cal. 3d 807, 841, 799 P.2d 1253, 1278, 274 Cal. Rptr. 820, 845; *Aerojet-General Corp. v. San Mateo County Superior Court* (1989), 211 Cal. App. 3d 216, 226, 258 Cal. Rptr. 684; *United States Fidelity & Guaranty Co. v. Specialty Coatings Co.* (1989), 180 Ill. App. 3d 378, 391-94; *Hazen Paper Co. v. United States Fidelity & Guaranty Co.* (1990), 407 Mass. 689, 700, 555 N.E.2d 576, 583.) Other courts have found that this term is unambiguous and excludes the cost of compliance with mandatory injunctions and/or response costs sought pursuant to CERCLA. (See, *e.g., Cincinnati Insurance Co. v. Milliken & Co.* (4th Cir. 1988), 857 F.2d 979, 981; *Mraz v. Canadian Universal Insurance Co.* (4th Cir. 1986), 804 F.2d 1325, 1329; *Aetna Casualty & Surety Co. v. Hanna* (5th Cir. 1955), 224 F.2d 499, 503; *Continental Insurance Co. v. Northeastern Pharmaceutical & Chemical Cos.* (8th Cir. 1988), 842 F.2d 977, 985-87 (*en banc*); *Desrochers v. New York Casualty Co.* (1954), 99 N.H. 129, 131, 106 A.2d 196, 198; *cf. School District of Shorewood v. Wausau Insurance Cos.* (1992), 170 Wis. 2d 347, 365-74, 488 N.W.2d 82, 88-91.) Still other courts have found that "damages" is unambiguous and that its ordinary, plain meaning includes the costs of compliance with mandatory injunctions and/or response costs. (See, *e.g., National Indemnity Co. v. United States Pollution Control, Inc.* (W.D. Okla. 1989), 717 F. Supp. 765, 766-67; *Broadwell Realty Services, Inc. v. Fidelity & Casu-*

*alty Co.* (1987), 218 N.J. Super. 516, 526, 528 A.2d 76, 82; *Boeing Co. v. Aetna Casualty & Surety Co.* (1990), 113 Wash. 2d 869, 877-81, 784 P.2d 507, 511-13.) We agree with this third group of courts.

Our primary purpose in construing the instant policy provision is to ascertain the intent of the parties. Initially, we look to the nature of the policy at issue and the risks undertaken by the insurer. The policies before us are *comprehensive general liability* insurance policies. Such a policy is a very broad liability policy whereby the insurer assumes a wide scope of risks. (See *Dora Township v. Indiana Insurance Co.* (1980), 78 Ill. 2d 376, 378-79.) In the instant case, Liberty Mutual intended to offer and OMC intended to purchase *comprehensive* protection against liability for property damage caused by an occurrence.

With this in mind, we turn to the interpretation of the term "damages." This term is not defined in the policies. Therefore, we must interpret this term by affording it its *plain, ordinary, and popular* meaning. (*Canadian Radium & Uranium Corp. v. Indemnity Insurance Co. of North America* (1952), 411 Ill. 325, 332.) As one authority on insurance law has written:

> " 'Usual and ordinary meaning' has been stated variously to be that meaning which the particular language conveys to the popular mind, to most people, to the average, ordinary, normal [person], to a reasonable [person], to persons with usual and ordinary understanding, to a business[person], or to a lay[person]." (2 Couch on Insurance 2d §15:18 (rev. ed. 1984).)

Webster's dictionary defines "damages" as "the estimated reparation in money for detriment or injury sustained: compensation or satisfaction imposed by law for a wrong or injury caused by a violation of a legal right." (Webster's Third New International Dictionary 571 (1986).) This definition does not distinguish between le-

gal compensatory damages or the costs of complying with a mandatory injunction. It merely indicates that "damages" stands for the money required to be expended in order to right a wrong. To the popular mind, to most people, to ordinary laypersons, "damages" connotes money one must expend to remedy an injury for which he or she is responsible, irrespective of whether that expenditure is compelled by a court of law in the form of compensatory damages or by a court of equity in the form of compliance with mandatory injunctions. (See *Aerojet-General Corp. v. San Mateo County Superior Court* (1989), 211 Cal. App. 3d 216, 226, 258 Cal. Rptr. 684, ____.) Whether OMC expends the money and conducts the cleanup itself or pays the money to the government as the injured public's representative and the government conducts the cleanup is of little consequence. In either case, OMC would have to expend money to remedy the environmental damage it has caused. For precisely this purpose, OMC insured itself by purchasing CGL policies.

That it is of little consequence whether the remedy is in the form of legal or equitable relief is especially true in the context of the broad protective purposes of a CGL insurance policy. Such a policy would be of little utility in protecting its purchaser if its coverage rises or falls upon the whim of the underlying plaintiff and whether the underlying complaint prayed for legal or equitable relief. (See 212 Ill. App. 3d at 242; *Aerojet-General Corp.*, 211 Cal. App. at 228, 258 Cal. Rptr. at ____.) In this regard, we note that, although the governmental agencies' initial complaints were not brought pursuant to CERCLA, these complaints were later amended to add counts alleging CERCLA violations. CERCLA was designed to allow governmental agencies flexibility in choosing the method by which they would protect our natural environment and enforce the Federal statute.

(See 212 Ill. App. 3d at 242.) CERCLA allows the agencies to exercise discretion in choosing from several forms of relief including mandatory injunctions, response or cleanup costs, and damages for injury to natural resources. (See 42 U.S.C. §§9606, 9607 (1988).) The utility of a CGL policy would be questionable if its coverage varied according to the discretion of a governmental agency in choosing the method by which it would enforce CERCLA and the type of relief it requested.

We cannot find that the parties intended the coverage of this comprehensive general liability policy to be so precarious. On the contrary, we find that, in light of the broad scope of this type of policy and the popular meaning of "damages," the parties intended these policies to cover liability for property damage caused by an occurrence regardless of whether that liability is equitable or legal in nature. (Accord *Minnesota Mining & Manufacturing Co. v. Travelers Indemnity Co.* (Minn. 1990), 457 N.W.2d 175, 181-82.) If the insurer had desired to restrict coverage to only those suits seeking legal, compensatory damages, it could have easily included among its exclusionary provisions an exclusion pertaining to the costs of complying with mandatory injunctions.

We therefore affirm the appellate court and hold that, under the facts of this case, the underlying actions were "suits seeking damages" which triggered Liberty Mutual's duty to defend OMC.

## III.

## POLLUTION EXCLUSIONS

We now address OMC's appeal. As stated above, the insurers all moved for summary judgment as to both their duty to defend OMC against the underlying actions and their duty to indemnify OMC for liabilities it has incurred because of the PCB contamination. The insurers'

motions for summary judgment were based on, *inter alia,* the pollution exclusion provisions in their respective policies. Relying on the pollution exclusions, the circuit court granted these motions for summary judgment on the issues of both the insurers' duty to defend OMC and their duty to indemnify OMC. Since these motions address two different issues (see, *e.g., Conway v. Country Casualty Insurance Co.* (1982), 92 Ill. 2d 388, 394), we will consider the rulings on each issue separately.

Initially, we are called upon to construe terms within the pollution exclusion provisions of the insurers' policies. With the exception of International (whose policy will be discussed separately), all the insurers' policies which contained pollution exclusion clauses provide in part:

> "This insurance does not apply *** to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is *sudden and accidental."* (Emphasis added.)

This standard pollution exclusion provision contains two parts: (1) the insurer excludes coverage for the release of environmentally toxic materials into any part of our natural environment and (2) the insurer makes an exception from this broad exclusion for toxic releases which are *sudden and accidental.* (See *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.* (1991), 144 Ill. 2d 64, 79.) In other words, the pollution exclusion exception reinstates coverage for toxic releases which are *sudden and accidental.* In the instant case, OMC has allegedly released PCBs into Waukegan Harbor and Lake Michigan. Therefore, it appears that the first part of the

exclusion applies. The issue before this court is whether, under the facts of this case, OMC's releases of PCBs were "sudden and accidental," thereby triggering the pollution exclusion exception and recreating coverage for OMC.

As stated above, in construing the terms in an insurance policy, the court must ascertain the intent of the parties. (See *Maryland Casualty Co. v. Chicago & North Western Transportation Co.* (1984), 126 Ill. App. 3d 150, 153.) If the terms in the policy are clear and unambiguous, the court must give them their plain, ordinary, popular meaning. (*Wilkin*, 144 Ill. 2d at 74.) If a term in the policy is subject to more than one reasonable interpretation within the context in which it appears, it is ambiguous. (*Wilkin*, 144 Ill. 2d at 74.) Ambiguous terms are construed strictly against the drafter of the policy and in favor of coverage. (*Wilkin*, 144 Ill. 2d at 74; *Maryland Casualty Co.*, 126 Ill. App. 3d at 152.) This is especially true with respect to exclusionary clauses. (*Reliance Insurance Co. v. Martin* (1984), 126 Ill. App. 3d 94, 96; see *Wilkin*, 144 Ill. 2d at 80.) This is so because there is little or no bargaining involved in the insurance contracting process (*Canadian Radium & Uranium Corp. v. Indemnity Insurance Co. of North America* (1952), 411 Ill. 325, 335), the insurer has control in the drafting process, and the policy's overall purpose is to provide coverage to the insured (see *United States Fidelity & Guaranty Co. v. Specialty Coatings Co.* (1989), 180 Ill. App. 3d 378, 384).

In the case *sub judice*, the appellate court found that "sudden" was an unambiguous term, construing it to mean "abrupt" with a quick, temporal element in its connotation. Since the underlying complaints alleged that OMC had been releasing PCBs into Waukegan Harbor and Lake Michigan for several years, the appellate court concluded that the underlying complaints alleged

"continuous" polluting by OMC which could not be considered "abrupt." Therefore, the appellate court granted summary judgment to the insurers, finding that they had no duty to defend or indemnify OMC because the broad pollution exclusions in their policies applied to exclude coverage for OMC under the facts of this case. 212 Ill. App. 3d at 243-49.

Before this court, OMC argues that the appellate court erred in its construction of the term "sudden." OMC contends that "sudden" is an ambiguous term and should be construed in its favor. OMC and its *amici* urge this court to construe "sudden" to mean unexpected or unintended. We find that the term "sudden" as used in the pollution exclusion exception contained in these "occurrence-based" CGL policies is ambiguous and that the appellate court erred in this regard.

Numerous dictionaries define "sudden" as happening unexpectedly, without notice or warning, or unforeseen. These same dictionaries also define "sudden" as abrupt, rapid, or swift. (See, *e.g.,* Webster's Third New International Dictionary 2284 (1986); American Heritage Dictionary of the English Language 1286 (10th ed. 1981); Black's Law Dictionary 1432 (6th ed. 1990).) Courts throughout the country are divided on the meaning of "sudden" within the instant context. (Compare, *e.g., United States Fidelity & Guaranty Co. v. Star Fire Coals, Inc.* (6th Cir. 1988), 856 F.2d 31, 34 ("sudden" is unambiguous and is construed to mean "abrupt"); *Lumbermens Mutual Casualty Co. v. Belleville Industries, Inc.* (1990), 407 Mass. 675, 680-81, 555 N.E. 2d 568, 572 (same); *Upjohn Co. v. New Hampshire Insurance Co.* (1991), 438 Mich. 197, 207, 476 N.W.2d 392, 397 (same); *Waste Management of Carolinas, Inc. v. Peerless Insurance Co.* (1986), 315 N.C. 688, 693, 340 S.E.2d 374, 381-83, with *Hecla Mining Co. v. New Hampshire Insurance Co.* (Colo. 1991), 811 P.2d 1083, 1091-92 ("sudden" is

ambiguous and construed to mean unintended or unexpected); *Claussen v. Aetna Casualty & Surety Co.* (1989), 259 Ga. 333, 335, 380 S.E.2d 686, 688 (same); *Broadwell Realty Services, Inc. v. Fidelity & Casualty Co.* (1987), 218 N.J. Super. 516, 531-35, 528 A.2d 76, 83-86 (same); *United Pacific Insurance Co. v. Van's Westlake Union, Inc.* (1983), 34 Wash. App. 708, 714-15, 664 P.2d 1262, 1265 (same).) Even panels of the Illinois appellate court are divided on this issue. (Compare *Specialty Coatings Co.*, 180 Ill. App. 3d at 384-88, with *International Minerals & Chemical Corp.*, 168 Ill. App. 3d at 376-80.) We conclude that the two definitions of "sudden" set forth above are both reasonable interpretations of this term in the context in which it appears. Therefore, "sudden" is, at a minimum, ambiguous as used in these policies. In Illinois, ambiguities and doubts in insurance policies are resolved in favor of the insured, especially those that appear in exclusionary clauses. (See, *e.g., Dora Township v. Indiana Insurance Co.* (1980), 78 Ill. 2d 376, 379; *Specialty Coatings Co.*, 180 Ill. App. 3d at 384.) Consequently, in this particular context, we construe "sudden" in favor of OMC and find it to mean unexpected or unintended.

The insurers and their *amici* argue that the rule of construction which directs the court to construe ambiguities in favor of the insured should not apply in the instant case. They assert that this rule of construction was developed to aid the unwary insured who is unsophisticated in insurance matters. The insurers argue that it should not apply here because OMC is a large corporation, sophisticated and counseled in insurance matters. We disagree with this contention. The insurance industry is powerful and closely knit. As evidenced by the CGL policies in the instant case, most policies are standard-form, are worded very similarly (see *Zurich Insurance Co. v. Raymark Industries, Inc.* (1987), 118 Ill. 2d 23,

33), and are offered on a take-it-or-leave-it basis (*Aetna Casualty & Surety Co. v. Condict* (S.D. Miss. 1976), 417 F. Supp. 63, 73). Any insured, whether large and sophisticated or not, must enter into a contract with the insurer which is written according to the insurer's pleasure by the insurer. (See *AIU Insurance Co. v. Superior Court* (1990), 51 Cal. 3d 807, 822, 799 P.2d 1253, 1264-65, 274 Cal. Rptr. 820, 831-32; *Broadwell Realty Services, Inc. v. Fidelity & Surety Co.* (1987), 218 N.J. Super. 516, 524, 528 A.2d 76, 80.) Generally, since little or no negotiation occurs in this process, the insurer has total control of the terms and the drafting of the contract. (*AIU Insurance Co.*, 51 Cal. 3d at 822, 799 P.2d at 1264-65, 274 Cal. Rptr. at 831-32; *Broadwell Realty Services, Inc.*, 218 N.J. Super. at 524, 528 A.2d at 80.) This rule of construction recognizes, *inter alia*, these facets of the insurance contracting process. (*AIU Insurance Co.*, 51 Cal. 3d at 822, 799 P.2d at 1264-65, 274 Cal. Rptr. at 831-32; *Broadwell Realty Services, Inc.*, 218 N.J. Super. at 524, 528 A.2d at 80.) Like any insured, OMC is entitled to its application where the court has determined that the policy is ambiguous. (See *Boeing Co. v. Aetna Casualty & Surety Co.* (1990), 113 Wash. 2d 869, 882, 784 P.2d 507, 514. But see *AIU Insurance Co.*, 51 Cal. 3d at 823, 799 P.2d at 1265, 274 Cal. Rptr. at 832.) After all, the insurer chose the words used in the policy. *Cf. Claussen*, 259 Ga. at 337, 380 S.E.2d at 688.

In addition, the insurers and their *amici* argue that this court's interpretation of "sudden" renders it mere surplusage, contrary to other Illinois rules of construction. These parties assert that courts must construe policies as a whole, with each part of the policy having significance and each word having an individual meaning. The appellate court was persuaded by the insurers' arguments in this regard and found that "sudden" had to mean "abrupt" or this term would be surplusage with

respect to the term "accidental" in the pollution exclusion exception. (212 Ill. App. 3d at 244-46.) The insurers correctly state the law, to a point. A court must strive to give each term in the policy meaning unless to do so would render the clause or policy inconsistent or inherently contradictory. (See *Sentry Insurance v. Hogan* (1982), 111 Ill. App. 3d 638, 640; *Hecla Mining Co.*, 811 P.2d at 1092.) In our view, construing "sudden" to mean "abrupt" creates a contradiction within this particular clause and the policy as a whole.

These CGL policies are "occurrence-based" policies of insurance. These policies provide coverage for property damage caused by an "occurrence." The policies at issue define "occurrence" as:

> "an *accident, including continuous or repeated exposure to conditions,* which results in \*\*\* property damage *neither expected nor intended* from the standpoint of the insured." (Emphasis added.)

The pollution exclusion exception retriggers coverage for toxic releases which are "sudden and accidental." The policies define "accident" to include "continuous or repeated exposure to conditions." (*Wilkin*, 144 Ill. 2d at 77.) In our view, an accidental release or discharge would include, according to the policy, a gradual release or a "continuous or repeated" release. To construe "sudden" to mean "abrupt" results in a contradiction if one accepts the insurers' own definition of the term "accident." (See *Hecla Mining Co.*, 811 P.2d at 1092.) Such a construction would result in the pollution exclusion exception clause retriggering coverage for toxic releases which are "abrupt" *and* gradual or "continuous or repeated" releases. Clearly, under such a construction this clause would be rendered absurd. (*Hecla Mining Co.*, 811 P.2d at 1092.) However, if "sudden" means unexpected or unintended, as it is defined by numerous dictionaries, the clause retriggers coverage for unexpected or unin-

tended releases which are exactly the type of uncertainties or risks that an insured would want to insure against. In light of the above, the insurers' argument must fail.

In addition, in our view, it is not coincidental that one of the definitions of "sudden" is unexpected or unintended and that an element of the policies' occurrence definitions is unexpected or unintended property damage. We recognize that, in the occurrence provision, it is the property damage that must be unexpected or unintended, whereas in the pollution exclusion exception it is the toxic release which must be unexpected or unintended. However, these clauses are closely related: one refers to the source of the property damage while the other refers to the property damage itself. Generally, an unexpected or unintended release would result in unexpected or unintended property damage. We find that, when the policy is viewed as a whole, these clauses work together to convey the intent of the parties that the policy's coverage would protect the insured from unexpected or unintended releases, including those that may have been continuous.

Further, we are not persuaded by the insurers' arguments concerning surplusage. As OMC and its *amici* note, insurance policies are filled with words which overlap and complement each other. For example, within the pollution exclusion provision itself, the policies read:

> *"discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants, or pollutants* ***."* (Emphasis added.)

These words all add contours to the general concept of a release of an environmentally toxic pollutant. It is not uncommon for provisions to appear in policies in this fashion. Faced with this common fact, we find the insurers' surplusage argument to be without merit.

In summary, we find that the term "sudden" in the pollution exclusion exception of these CGL policies is ambiguous and we construe it in favor of the insured to mean unexpected or unintended. We find that the appellate court erred in its construction of the term. Both the circuit and appellate courts relied on this erroneous construction of "sudden" in ruling in favor of the insurers on their motions for summary judgment as to their duties to defend and indemnify OMC based on their pollution exclusion provisions. Because different standards apply with respect to the duty to defend and the duty to indemnify (see *Conway*, 92 Ill. 2d at 394; *City of Johnstown, New York v. Bankers Standard Insurance Co.* (2d Cir. 1989), 877 F.2d 1146, 1148), we shall address the rulings with respect to each duty separately.

## A.

### Duty to Defend

An insurer's duty to defend its insured is much broader than its duty to indemnify. (*Conway*, 92 Ill. 2d at 394; *Keene Corp. v. Insurance Co. of North America* (D.C. Cir. 1981), 667 F.2d 1034, 1050.) In order to determine whether the insurer's duty to defend has arisen, the court must compare the allegations of the underlying complaint to the policy language. (See, *e.g., Wilkin*, 144 Ill. 2d at 73; *Raymark Industries, Inc.*, 118 Ill. 2d at 41.) The allegations in the underlying complaint must be liberally construed in favor of the insured. (*Wilkin*, 144 Ill. 2d at 74.) If the court determines that these allegations fall within, or *potentially within*, the policy's coverage, the insurer has a duty to defend the insured against the underlying complaint. *Wilkin*, 144 Ill. 2d at 73; *Raymark Industries, Inc.*, 118 Ill. 2d at 41, 52.

The circuit and appellate courts ruled in favor of the insurers on the duty to defend issue based on their pollu-

tion exclusion provisions. Construing "sudden" to mean abrupt, these courts determined that the underlying complaints alleged that OMC had released PCBs over a period of several years. They found that the underlying complaints alleged a continuous release of PCBs which could not be considered "abrupt." Therefore, these courts held that, because of the CGL policies' pollution exclusion provisions, OMC's release of PCBs did not fall potentially within the policies' coverage. Consequently, these courts held that the insurers had no duty to defend OMC.

We have, however, determined that the circuit and appellate courts erred in their construction of the term "sudden" and we have construed this term in favor of OMC to mean unexpected or unintended. Therefore, the sudden and accidental exception to the policies' pollution exclusion provision applies to unexpected and unintended releases of pollutants, recreating coverage for such releases.

With this construction in mind, we turn to a comparison of the allegations of the underlying complaints with the language of the policies. In the instant case, the underlying complaints merely allege that OMC discharged PCBs into Waukegan Harbor and Lake Michigan over a period of several years. Nowhere in these complaints is there any allegation that OMC intended or expected to release PCBs into Waukegan Harbor or Lake Michigan. In the absence of such an allegation, the underlying complaints allege facts that fall potentially within the coverage of the policies. (*Hecla Mining Co.*, 811 P.2d at 1088; *cf. City of Johnstown, New York*, 877 F.2d at 1149.) Looking at the face of the underlying complaints, OMC's alleged release of PCBs *could* have been unexpected and unintended, thereby bringing these allegations potentially within the "sudden and accidental" exception. (See *Reliance Insurance Co. v. Martin* (1984),

126 Ill. App. 3d 94, 97-98; *Willett Truck Leasing Co. v. Liberty Mutual Insurance Co.* (1980), 88 Ill. App. 3d 133, 139; *Hecla Mining Co.*, 811 P.2d at 1092.) Therefore, under the broad duty to defend standard set forth above, we find that the appellate court erred in affirming summary judgment for the insurers based on their pollution exclusion provisions with respect to the issue of their duty to defend OMC. Accordingly, we reverse the appellate court's grant of summary judgment in favor of the insurers on pollution exclusion grounds with respect to their duty to defend OMC.

## B.

### Duty to Indemnify

We now consider the insurers' motions for summary judgment concerning their duty to indemnify OMC based on the pollution exclusions. As stated earlier, the appellate court upheld the circuit court's grant of summary judgment in favor of the insurers on these motions.

An insurer's duty to indemnify is narrower than its duty to defend its insured. (See, *e.g., Conway*, 92 Ill. 2d at 394; *International Minerals & Chemical Corp. v. Liberty Mutual Insurance Co.* (1988), 168 Ill. App. 3d 361, 366.) The duty to indemnify " 'will not be defined until the adjudication of the very action which [the insurer] should have defended.' " (*Maryland Casualty Co. v. Chicago & North Western Transportation Co.* (1984), 126 Ill. App. 3d 150, 156, quoting *Centennial Insurance Co. v. Applied Health Care Systems, Inc.* (7th Cir. 1983), 710 F.2d 1288, 1291 n.6; see *Wilkin*, 144 Ill. 2d at 73.) In other words, the question of whether the insurer has a duty to indemnify the insured for a particular liability is only ripe for consideration if the insured has already incurred liability in the underlying claim against it. (See, *e.g., Wilkin*, 144 Ill. 2d at 73; *Raymark Industries, Inc.*,

118 Ill. 2d at 52; *International Minerals*, 168 Ill. App. 3d at 366.) If so, the duty to indemnify arises if the insured's activity and the resulting loss or damage *actually* fall within the CGL policy's coverage. *Cf. Willett Truck Leasing Co.*, 88 Ill. App. 3d at 139; *Waste Management of Carolinas, Inc. v. Peerless Insurance Co.* (1986), 315 N.C. 688, 690, 340 S.E.2d 374, 377.

In the case at bar, OMC and the governmental agencies have already entered into a consent decree requiring OMC to contribute approximately $19 million to a trust fund for the costs to clean up Waukegan Harbor and part of Lake Michigan. Clearly, OMC has incurred liability for releasing PCBs into these bodies of water. Therefore, the issue presented is whether OMC's activity, with respect to the pollution exclusion exception, actually falls within the policies' coverage: Was OMC's release of PCBs unexpected and unintended? In cases of multiple insurers and policies, this question must be examined with respect to each policy and its particular time period.

In this case, the insurers and their *amici* argue that OMC knew it was discharging waste materials from its facility as early as 1959. These parties assert that, if OMC intended or expected to release any waste materials, there is no coverage. They argue that it is irrelevant whether OMC knew or should have known it was releasing PCBs so long as OMC knew it was releasing *some* effluent or waste material which later turned out to contain PCBs. OMC responds that it could not have expected or intended the release of PCBs into Waukegan Harbor. It argues that it constructed a waste treatment system through which it routed its effluent to the North Ditch in order to avoid polluting Waukegan Harbor. OMC also asserts that it did not even know that the product it was using, Pydraul, contained PCBs until informed of this fact by Monsanto in 1970.

Neither party is entirely correct in its analysis of the CGL policies at issue here. These policies have many provisions defining and limiting the scope of their coverage. The motions before us concern the "sudden and accidental" pollution exclusion exception. The insurers are correct that, in this particular provision, it is the release or discharge, the *polluting activity,* which must be unexpected and unintended. However, the insurers are not correct in arguing that the expected or intended release of *any waste material* bars the application of this provision. On the contrary, OMC's release of some types of waste material was not only expected and intended, but was expressly authorized and permitted by governmental agencies. The relevant consideration here is whether the insured expected and intended to discharge *the particular toxic it is alleged to have discharged and for which it now seeks coverage.* If OMC's release of PCBs into Waukegan Harbor and Lake Michigan was expected and intended, the "sudden and accidental" exception to the pollution exclusion clause would not apply and OMC's loss would not be covered.

Another important consideration in determining whether the insurers have a duty to indemnify OMC is the scope of OMC's claim for coverage. In this case, OMC is claiming indemnity for the cleanup costs of Waukegan Harbor and Lake Michigan. OMC is not claiming indemnity with respect to the North Ditch. Intended and expected discharges of waste into the North Ditch would not preclude indemnity with respect to Waukegan Harbor.

From the record before us, it is clear that there are numerous disputed issues of fact material to the resolution of this issue. Summary judgment is inappropriate when material fact questions exist. (See *Pyne v. Witmer* (1989), 129 Ill. 2d 351, 357-58.) Therefore, we reverse the appellate court's ruling in favor of the insurers on

their motions for summary judgment based on pollution exclusion grounds with respect to their duty to indemnify OMC for the costs of cleaning up Waukegan Harbor and Lake Michigan. We remand this issue to the circuit court for further proceedings. On remand, the trier of fact must determine whether and, if so, at what point in time OMC expected and intended the release of PCBs for which it now seeks coverage. If the trier finds that OMC expected and intended this release, the sudden and accidental exception is not triggered and policies issued thereafter would not provide coverage. If the trier finds that some of these releases were unexpected and unintended, the sudden and accidental exception of the particular policy in force at that time would apply and the insurer's duty to indemnify OMC would arise.

## IV.

## INTERNATIONAL

We turn now to consider the appellate court's rulings on International's motions for summary judgment based on its policy's pollution exclusion provision. The appellate court granted summary judgment to International as to both its duty to defend and its duty to indemnify OMC, finding that its CGL policy's pollution exclusion provision barred coverage for OMC in this particular case. The pollution exclusion provision in International's policy is different from the standard pollution exclusion provision discussed above. International's policy provides in pertinent part:

> "It is agreed this policy shall not apply to liability for *contamination or pollution* of land, water, air or real or personal property or any injuries or damages resulting therefrom caused by *an occurrence.*
>
> It is further agreed that for the purpose of this endorsement *'occurrence' means a continuous or repeated exposure to conditions* which unexpectedly and uninten-

tionally causes injury to persons or tangible property during the policy period. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence." (Emphasis added.)

Unlike the pollution exclusion provision previously considered above, International's pollution exclusion provision excludes coverage for property damage resulting from continuous or repeated exposure to pollutants, *i.e.,* it excludes coverage for gradual polluting events. Moreover, International's pollution exclusion does not contain an exception for sudden and accidental releases. In the case at bar, both the circuit and appellate courts noted that the underlying complaints alleged that OMC had caused environmental property damage from a continuous, long-term release of PCBs. Therefore, these courts determined that International's pollution exclusion barred coverage for OMC's release of PCBs and granted summary judgment to International on this basis.

Before this court, OMC argues that the appellate court erred in granting summary judgment to International because disputed issues of fact exist concerning whether its alleged release of PCBs was continuous or repeated. OMC contends that it submitted counteraffidavits with its response to International's motions which reveal a factual dispute over the nature of the release or releases and the possibility that the release or releases could have occurred abruptly.

A motion for summary judgment will be granted if the pleadings, depositions, affidavits, and admissions on file reveal that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. (*Kolakowski v. Voris* (1980), 83 Ill. 2d 388, 398.) In considering a motion for summary judgment, the court must construe the pleadings, depositions, admissions, and affidavits strictly against the moving party

and liberally in favor of the nonmovant. *Kolakowski*, 83 Ill. 2d at 398.

Pursuant to Supreme Court Rule 191, all affidavits in support of and in opposition to a motion for summary judgment must be made upon the personal knowledge of the affiant, must set forth with particularity the facts upon which the claim or defense is made, and must set forth facts admissible in evidence to which the affiant, if called to testify, could competently testify thereto. (134 Ill. 2d R. 191(a).) Statements in an affidavit which are based on information and belief or which are unsupported conclusions, opinions, or speculation are insufficient to raise a genuine issue of material fact. (See *Anderson "Safeway" Guard Rail Corp. v. Champaign Asphalt Co.* (1971), 131 Ill. App. 2d 924, 928; *Patterson v. Stern* (1967), 88 Ill. App. 2d 399, 404.) Moreover, the mere allegation that material factual disputes exist does not create a triable issue of fact. *Anderson Corp.*, 131 Ill. App. 2d at 927.

In the case *sub judice*, OMC submitted counteraffidavits from various affiants in opposition to International's motions for summary judgment. In these counteraffidavits, the affiants set forth possible ways in which the release of PCBs into Waukegan Harbor could have been abrupt. For example, Alfred Hanson, OMC's corporate environmental control specialist, states in his counteraffidavit that the release of Pydraul into Waukegan Harbor could have resulted from a mechanical or electrical failure of OMC's pumping system. However, OMC did not submit any documents indicating that any mechanical or electrical failure of the pumping system occurred during the time period in question. Likewise, OMC submitted a counteraffidavit from John Crawford, a chemical engineer in OMC's employ. In his counteraffidavit, Crawford states that the contamination could have resulted from an abrupt and unexpected surge of water through the

waste treatment system, breaking some Pydraul away from the oil interceptors and sweeping it into Waukegan Harbor.

We find that these counteraffidavits are insufficient to create a material issue of fact. They do not set forth particular facts within the personal knowledge of the affiants to which the affiants could competently testify at trial. These counteraffidavits contain mere speculation concerning various hypothetical scenarios by which OMC's alleged release of PCBs could have occurred abruptly. As such, they are insufficient to raise material issues of fact. Based on the record as a whole, we conclude that OMC's release of PCBs into Waukegan Harbor was either continuous or repeated. Therefore, International's pollution exclusion provision bars coverage for OMC under its policy. We affirm the appellate court's grant of summary judgment to International with respect to both its duty to defend and its duty to indemnify.

## V.

## CONCLUSION

In summary, we affirm the circuit court's grant of summary judgment to INA with respect to its duty to defend and indemnify OMC based on the known loss doctrine. We affirm the circuit court's denial of the other carriers' motions for summary judgment based on known loss and we remand this issue to the circuit court for further proceedings in accordance with this opinion. We affirm the appellate court's grant of partial summary judgment to OMC based on the "damages" issue, holding that the underlying actions are "suits seeking damages" which fall within the coverage afforded by the CGL policies. In addition, we reverse the appellate court's grant of summary judgment to the insurers, ex-

cluding International, based on the pollution exclusion clauses of their respective policies and we remand this issue to the circuit court for further proceedings in accordance with this opinion. Finally, we affirm the appellate court's grant of summary judgment to International based on its policy's pollution exclusion clause.

The judgment of the appellate court is affirmed in part and reversed in part, the judgment of the circuit court is affirmed in part and reversed in part, and the cause is remanded to the circuit court for further proceedings.

> *Appellate court affirmed in part*
> *and reversed in part;*
> *circuit court affirmed in part*
> *and reversed in part;*
> *cause remanded.*

CHIEF JUSTICE MILLER, concurring in part and dissenting in part:

I do not agree with the majority's conclusion that the language used in the standard pollution exclusion clauses is ambiguous. In my view, the clauses clearly exclude coverage for the series of occurrences at issue here.

With one exception, the pollution exclusion clauses appearing in the comprehensive general liability (CGL) policies involved in this appeal provide as follows:

"This insurance does not apply *** to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental."

Coverage will be provided for environmental mishaps otherwise excluded under the policy if the incident is

"sudden and accidental." As the majority points out, substantial disagreement exists regarding the meaning of the word "sudden." The question here is whether the word "sudden," as it is used in the pollution exclusion clauses of the CGL policies at issue, means only unexpected and unforeseen, or whether it also has a temporal quality. Finding the term, as it is used in this context, to be susceptible to alternative definitions and hence ambiguous, the majority adopts a construction favoring the insured and concludes that the present matters may be covered by the CGL policies containing this phraseology. I do not agree.

The pollution exclusion generally bars coverage for liability arising from the discharge of pollutants. The exception to the exclusion reinstates that coverage, but only if the discharge is both "sudden and accidental." Clearly, the parties intended to preclude coverage for gradual discharges of pollutants. Accordingly, in the sense in which "sudden" is used here, the term clearly has a temporal dimension, referring to the abruptness of the event. See, *e.g., Northern Insurance Co. v. Aardvark Associates, Inc.* (3d Cir. 1991), 942 F.2d 189 (applying Pennsylvania law); *United States Fidelity & Guaranty Co. v. Star Fire Coals, Inc.* (6th Cir. 1988), 856 F.2d 31 (applying Kentucky law); *Lumbermens Mutual Casualty Co. v. Belleville Industries, Inc.* (1990), 407 Mass. 675, 555 N.E.2d 568; *Upjohn Co. v. New Hampshire Insurance Co.* (1991), 438 Mich. 197, 476 N.W.2d 392; *Waste Management of Carolinas, Inc. v. Peerless Insurance Co.* (1986), 315 N.C. 688, 340 S.E.2d 374.

Indeed, defining "sudden" without a temporal element renders redundant the companion term "accidental." "Accidental" signifies something that is unexpected or unintended. (See *Taylor v. John Hancock Mutual Life Insurance Co.* (1957), 11 Ill. 2d 227, 230.) Applying those

same senses to "sudden," as the majority does, makes "accidental" mere surplusage. As one court has stated:

> "For the word 'sudden' to have any significant purpose, and not to be surplusage when used generally in conjunction with the word 'accidental,' it must have a temporal aspect to its meaning, and not just the sense of something unexpected." *Lumbermens Mutual Casualty Co. v. Belleville Industries, Inc.* (1990), 407 Mass. 675, 680, 555 N.E.2d 568, 572.

The majority dismisses this concern as inconsequential, declaring that insurance contracts are generally filled with overlapping terms. (154 Ill. 2d at 124.) What the majority ignores, however, is that "sudden" is joined to "accidental" by the conjunction "and," not by the disjunction "or." The parties clearly intended that the circumstances triggering the exception to the pollution exclusion would be both "sudden" and "accidental"; an incident of pollution must satisfy both requirements for coverage to exist. See *Lower Paxon Township v. United States Fidelity & Guaranty Co.* (1989), 383 Pa. Super. 558, 577, 557 A.2d 393, 402 ("The very use of the words 'sudden *and* accidental' (emphasis added) reveal[s] a clear intent to define the words differently, stating two separate requirements").

The majority also believes that construing "sudden" in the temporal sense of "abrupt" would contradict the policy definition of "occurrence." (See 154 Ill. 2d at 123-24.) Contrary to the majority's view, however, adopting the insurers' interpretation of the term does not give rise to an inconsistency within the policy as a whole. The definition of "occurrence" relates to property damages; the pollution exclusion, in contrast, relates to the manner in which the polluting dispersal, discharge, release, or escape occurs. There is no reason to believe that the provisions were intended to be defined in parallel terms, or that the exclusion is a restatement of the occurrence

definition. (See *Lumbermens Mutual Casualty Co. v. Belleville Industries, Inc.* (1990), 407 Mass. 675, 679, 555 N.E.2d 568, 571; *Claussen v. Aetna Casualty & Surety Co.* (1989), 259 Ga. 333, 334, 380 S.E.2d 686, 687-88; Abraham, *Environmental Liability and the Limits of Insurance,* 88 Colum. L. Rev. 942, 962-64 (1988).) Discussing the same question, one court has observed:

> "We have no difficulty reconciling the two provisions. We believe the 'occurrence' definition results in a policy that provides coverage for continuous or repeated exposure to conditions causing damages in all cases except those involving pollution, where coverage is limited to those situations where the *discharge* was 'sudden and accidental.' " (Emphasis in original.) (*United States Fidelity & Guaranty Co. v. Star Fire Coals, Inc.* (6th Cir. 1988), 856 F.2d 31, 34 (applying Kentucky law).)

It is not remarkable that "occurrence" is defined more broadly than the coverage reinstated under the pollution exclusion for sudden and accidental discharges.

As a final matter, even if the term "sudden" is considered ambiguous, I do not believe that the incidents at issue here can be said to fall within the exception to the pollution exclusion. Granting the existence of alternative definitions of the term, including the one adopted by the majority, I fail to see how occurrences continuing for more than a decade may be considered "sudden" under any reasonable reading of that word.

JUSTICE HEIPLE joins in this partial concurrence and partial dissent.