MARTIN J. WAITZMAN, Plaintiff-Appellee, v. CLASSIC SYNDICATE, INC., *et al.*, Defendants-Appellants.

First District (6th Division)    No. 1—93—3178

Opinion filed January 6, 1995.—Modified on denial of rehearing March 31, 1995.

Peterson & Ross, of Chicago (Michael P. Tone and Cecilia M. Clarke, of counsel), for appellants.

Horvath & Lieber, of Chicago (John F. Horvath and Susan L. Troxell, of counsel), for appellee.

JUSTICE EGAN delivered the opinion of the court:

This is an appeal by the insurer defendants from summary judgment granted in favor of the plaintiff insured, Martin J. Waitzman.

The plaintiff was both a licensed attorney and a certified public accountant. He practiced both accounting and law. He was a member of the law firm of Kovitz, Shifrin & Waitzman (KS&W). On October 10, 1989, the defendants issued the plaintiff an accountants' professional liability policy (the policy), which provided insurance against negligent acts, errors or omissions in rendering professional accounting services. The policy stated:

"THIS IS A CLAIMS MADE POLICY. EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED AND REPORTED TO THE COMPANY WHILE THE POLICY IS IN FORCE. ***

THIS POLICY EXCLUDES PRIOR ACTS, UNLESS SHOWN TO BE COVERED ON THE DECLARATIONS AND/OR CERTIFICATE OF INSURANCE. IT PROVIDES NO COVERAGE OR DEFENSE FOR ACTS, ERRORS OR OMISSIONS WHICH OCCUR PRIOR TO THE EFFECTIVE DATE OF THE FIRST POLICY ISSUED OR IF EARLIER, THE RETROACTIVE DATE SHOWN ON THE CERTIFICATE OF INSURANCE ISSUED TO THE SPECIFIC ADDITIONAL INSURED."

Regarding retroactive coverage, the policy provided that "RETRO ACTIVE [sic] COVERAGE IS HERE BY [sic] GRANTED BACK TO THE FIRST DATE THAT CONTINUOUS CLAIMS MADE COVERAGE HAS BEEN CARRIED WITH MINIMUM LIMITS OF $250,000." The policy was effective for the period of February 1, 1990, to February 1, 1993. The plaintiff had another policy which provided coverage above this minimum dollar limit for the period of February 1, 1989, to February 1, 1990.

In 1985 or 1986, Capital Metals, a steel processing company, engaged the plaintiff as its accountant. Joseph Dydio, the sole

shareholder and president of Capital Metals, also hired the plaintiff to perform personal accounting services for him. In 1986, KS&W and Waitzman also began to perform legal work for Capital Metals and Dydio.

On September 25, 1990, Capital Metals and Dydio asserted accounting and legal malpractice claims against the plaintiff and KS&W. On October 18, 1990, the attorneys retained by the Home Insurance Company (Home), the legal malpractice insurer for KS&W, wrote a letter notifying the defendants of the claims against the plaintiff and KS&W.

In a November 2, 1990, letter to the plaintiff, the defendants requested proof of continuous claims-made coverage back to the date on which he first began performing accounting services for Capital Metals and Dydio. The defendants repeated this request in a March 21, 1991, letter and in a May 10, 1991, letter. In the May letter, the defendants also told the plaintiff that, if he could not show continuous claims-made coverage back to 1985, he would have no coverage under the policy. On May 31, 1991, the plaintiff provided the defendants with copies of accountants' professional liability policies for the following periods: March 5, 1984, to March 5, 1985; April 22, 1985, to April 22, 1986; and February 1, 1989, to February 1, 1990. On June 6, 1991, the defendants wrote the plaintiff that the 1984 and 1985 policies did not list him as an insured and that they would deny coverage if the plaintiff did not provide proof of continuous coverage back to 1985.

On August 13, 1991, Capital Metals and Dydio filed a complaint against the plaintiff and his law firm alleging that the plaintiff performed accounting services for them between 1986 and the spring of 1990. The complaint alleged negligence in connection with those accounting services:

> "20. Waitzman and/or KS&W prepared the year[-]end financial statements for Capital Metals for 1986, 1987 and 1988, as well as various monthly or quarterly statements. Waitzman and/or KS&W were also engaged to conduct a year[-]end audit for Capital Metals for 1989. While they completed this audit in May 1990, they refused to release the Audit Report and financials unless Dydio guaranteed payment of all their bills to Capital Metals.

> \* \* \*

> 28. Under an Audit Report, dated March 7, 1989, Waitzman issued the year[-]end financial statements for December 31, 1988 ['the 1988 Audit']. This Audit Report purported to be conducted 'in accordance with generally accepted auditing standards.' \*\*\*

> \* \* \*

30. As more fully set forth below, the 1986 and 1987 Financials and 1988 Audit were not prepared with due professional care, skill and competence. They were not prepared in accordance with generally accepted accounting principles, nor generally accepted accounting or auditing standards. As a result, they misstated Capital Metals' true financial condition, overstating its inventory, accounts receivable, assets, retained earnings, shareholders['] equity and income.

\* \* \*

48. \*\*\* Bartosek[, a potential buyer,] reviewed [ ] information [on Capital Metals' operation] and met with Waitzman and Dydio in July 1989.

49. At this meeting, Bartosek questioned the values of the inventory and accounts receivable[ ] reported in the 1988 Audit. Waitzman represented that he had a full knowledge of the inventory and that, if anything, its value was understated by $40,000. Waitzman also stated that the value for the accounts receivable was an accurate figure, which could be relied upon.

50. At this meeting, Waitzman and Bartosek also discussed the sales value of Capital Metals. Bartosek stated that he believed the company to be worth about $4,500,000, based on a multiple of 3 to 3.5 of its operating income. In response, Waitzman stated that, based on the 1988 Audit and its historic performance, Capital Metals was worth 'a hell of a lot more' and that if it were only worth $4,500,000, 'he would buy it himself.' Waitzman therefore recommended that Dydio abstain from seeking an immediate sale.

\* \* \*

54. \*\*\* Capital Metals['] retained earnings were only $135,000 as of October 31, 1989. A subsequent CPA Report, dated December 29, 1989, showed a further decline of retained earnings to $125,000 as of November 30, 1989. \*\*\*

55. In January, 1990, the Exchange Bank declared a default on Capital Metals' loan and advised it to obtain refinancing elsewhere. The reasons given for this default [were] the failure to deliver financial statements in a timely fashion, failure to maintain a sufficient tangible net worth and the submission of inaccurate information on the collateral.

\* \* \*

58. On June 13, 1990, Capital Metals executed [an assignment to a trustee for the benefit of its creditors], because it could not continue to both operate and meet the terms of extension agreement[s] with the Banks."

On September 3, 1991, the defendants sent the plaintiff a letter in which they informed him that "[the insurers] will be unable to re-

spond to this law suit" because he had not provided proof of continuous claims-made coverage back to the date he first performed accounting services for Capital Metals and Dydio. The defendants cited the following language from the policy's "Coverage" section:

"An act, error or omission which is continuing in nature shall, for all purposes of this policy, be deemed to occur only on the date on which such act, error or omission commences and not on any subsequent date. A series of identical or related acts, errors or omissions shall be deemed to occur on the date on which the earliest of such acts, errors or omissions commences."

On September 12, 1991, the defendants sent the plaintiff's attorney another letter, in which they demanded arbitration of their dispute with the plaintiff. In this letter, they also offered, under a full reservation of rights, to enter into an agreement by which they would pay 50% of the plaintiff's reasonable attorney fees and Home would pay the remaining 50%.

On September 25, 1991, the plaintiff filed his complaint for a declaration that (1) the defendants had a duty under the policy to defend the plaintiff against the Capital Metals complaint; (2) the defendants violated this duty by refusing to defend in the September 3, 1991, letter; and (3) the defendants were estopped from relying on any provision in the policy. The judge granted summary judgment in favor of the plaintiff and also granted the plaintiff's prayer for attorney fees incurred by the plaintiff in bringing the declaratory judgment action.

The defendants first argue that the plaintiff's complaint failed to state a claim for relief because, they say, the arbitration agreement in the policy divested the trial court of jurisdiction. The arbitration agreement provides:

"In the event that a dispute arises between an Insured and the Company with respect to (1) coverage; (2) liability for premiums, deductibles, or other amounts; or (3) any term or condition of the policy, the matter shall be resolved by arbitration."

The defendants contend that the issue of their duty to defend is either a coverage dispute or a dispute over a term or condition of the policy. In denying their motion to dismiss, the judge concluded that the defendants' duty to defend did not fall within the scope of this provision.

Although the defendants correctly assert that the courts and the legislature favor arbitration as a means of dispute resolution, "[t]he public policy favoring the submission of disputes to arbitration does not allow us to do violence to the expressed intention of the parties or to ignore the fundamental that an agreement to submit a dispute to arbitration is contractual in nature." *(United Cable Television*

*Corp. v. Northwest Illinois Cable Corp.* (1989), 128 Ill. 2d 301, 310, 538 N.E.2d 547.) Courts require parties to arbitrate only what they have agreed to arbitrate by "clear language and their intentions expressed in the language." (*Rauh v. Rockford Products Corp.* (1991), 143 Ill. 2d 377, 387, 574 N.E.2d 636.) When it is clear that the dispute a party seeks to arbitrate is not within the scope of the arbitration agreement, a "court must decide the arbitrability issue in favor of the party opposing arbitration because there is no agreement to arbitrate." *Brookfield-North Riverside Water Comm'n v. Abbott Contractors, Inc.* (1992), 250 Ill. App. 3d 588, 596, 621 N.E.2d 153, citing *Donaldson, Lufkin, & Jenrette Futures, Inc. v. Barr* (1988), 124 Ill. 2d 435, 530 N.E.2d 439.

To determine the scope of an arbitration clause, a court must examine the language of the clause and the terms of the contract. (*Atkins v. Rustic Woods Partners* (1988), 171 Ill. App. 3d 373, 378, 525 N.E.2d 551.) In this case, the language of the arbitration clause and the terms of the insurance policy lead to the conclusion that a dispute over the defendants' duty to defend is not within the scope of the arbitration agreement.

■ It is well established that an insurer's duty to defend is distinct from its duty to indemnify; the former is a broader duty. (See, *e.g., Aetna Casualty & Surety Co. v. Prestige Casualty Co.* (1990), 195 Ill. App. 3d 660, 664, 553 N.E.2d 39, citing *Conway v. Country Casualty Insurance Co.* (1982), 92 Ill. 2d 388, 442 N.E.2d 245.) Moreover, the language and structure of the insurance policy here demonstrate that these are separate duties. The policy defines the defendant's duty to provide coverage in a section entitled "Coverage." That section provides in part as follows:

> "Subject to the terms and conditions of this policy, including but not limited to, the Exclusions, to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as Damages ***."

It is obvious to us that when the parties talk about the insurer's duty to pay, they are talking about the duty to indemnify and not the duty to defend. The defendants' duty to defend is defined in the next separate section of the policy entitled "Defense and Settlement."

Further, the duty to defend is not a "term or condition of the policy." Although the policy does not define "term," it defines "condition" in an article entitled "Conditions," which lists conditions of the policy. The defendants' duty to defend does not appear in this article.

The defendants argue that the words "term or condition" encompass any dispute arising under the policy. Their argument is refuted, however, by the language of the arbitration clause. That

clause specifies certain arbitrable disputes, such as disputes over liability for premiums and deductibles. The fact that the agreement specifies these disputes shows that the "term or condition" language is not so broad that it covers any dispute arising under the policy. If the defendants had intended to arbitrate "any dispute" arising under the policy, they could have used such language when they drafted the agreement. See, *e.g, Atkins*, 171 Ill. App. 3d at 378.

We turn now to the defendants' claim that the acts alleged in the underlying complaint did not fall within the policy and that the plaintiff failed to provide proof of continuous claims-made coverage from the date he first performed accounting services for Capital Metals.

An insurer's duty to defend an action brought against an insured is triggered when a filed complaint alleges facts which are within, or potentially within, the coverage of the policy, without regard to whether the allegations are groundless, false, or even fraudulent. *(United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.* (1991), 144 Ill. 2d 64, 578 N.E.2d 926.) Even if only one of the theories of recovery stated in the complaint comes within the scope of coverage under the policy, the insurer has a duty to defend. *United States Fidelity & Guaranty Co.*, 144 Ill. 2d at 73; *Tuell v. State Farm Fire & Casualty Co.* (1985), 132 Ill. App. 3d 449, 477 N.E.2d 70.

In determining whether the complaint contains an allegation within the policy coverage, the complaint and the insurance policy must be liberally construed in favor of the insured. *(United States Fidelity & Guaranty Co.*, 144 Ill. 2d at 74.) The insurer, therefore, has a duty to defend unless it is *clear* from the face of the complaint that the allegations are beyond the coverage, or potential coverage, of the policy. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.* (1992), 154 Ill. 2d 90, 607 N.E.2d 1204.

■ In this case, the defendants had a duty to defend because the Capital Metals complaint alleged facts potentially within the coverage of the policy. The parties concede that the retroactive date for coverage was February 1, 1989. Consequently, if the Capital Metals complaint alleged any negligent act, error or omission after this date and before February 1, 1993, the defendants had a duty to defend the plaintiff in the declaratory judgment.

The Capital Metals complaint does contain some allegations of acts within this period. In the complaint, Capital Metals alleged that Waitzman completed an audit for Capital Metals in March 1989. It claims that Waitzman completed the audit in 1989 and then refused to release it unless Dydio personally guaranteed bills for Waitzman's services to Capital Metals. Capital Metals also alleged that, in con-

nection with a July 1989 meeting, Waitzman gave an opinion on the value of Capital Metals and advised Dydio not to sell the company. All of these allegedly negligent acts occurred after the retroactive date of the policy and were, therefore, at the very least, potentially within the coverage of the policy. We judge that the defendants were required to defend the Capital Metals complaint.

The defendants next claim that the "other insurance" clause of the policy excuses their refusal to defend. In the article entitled "Conditions," the "Other Insurance" section provides:

> "This insurance shall be excess over any other valid and collectible insurance, whether such insurance is state[d] to be primary, contributory, excess, contingent or otherwise."

The defendants argue that summary judgment was improper because there is a question of fact as to whether another insurer has the duty to defend as the plaintiff's primary insurer. The defendants stated in their cross-motion for summary judgment that Home was representing KS&W in the Capital Metals suit. The defendants also asserted that, by failing to provide them with the Home policy, the plaintiff failed to respond to their discovery request for lawyers' malpractice policies issued to him or to KS&W.

■ The defendants have failed to demonstrate a genuine issue of material fact concerning the existence of other "valid and collectible insurance." Summary judgment is proper when the pleadings, depositions, admissions on file and any affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. (735 ILCS 5/2—1005(c) (West 1992).) "In order to withstand a motion for summary judgment, the nonmoving party must come forward with evidentiary material that establishes a genuine issue of fact." (*Salinas v. Chicago Park District* (1989), 189 Ill. App. 3d 55, 59, 545 N.E.2d 184.) The defendants have not met this burden.

The mere fact that Home defended KS&W in the Capital Metals suit does not establish an issue of fact regarding the existence of other "valid and collectible" insurance for the accounting malpractice claims against the plaintiff. In fact, the record indicates that KS&W was the insured under this policy and that the Home policy was a policy for legal malpractice. There is also no evidence of the coverage period of the Home policy.

The defendants' allegations concerning the plaintiff's failure to produce the Home policy do not relieve the defendants of their burden to produce evidence that this policy constitutes "valid and collectible" insurance. The defendants' access to evidence of the Home policy was not foreclosed by the plaintiff's alleged noncompli-

ance with their discovery request. For these reasons, we conclude that the judge properly granted summary judgment for the plaintiff when he ordered that the defendants were required to provide the plaintiff with a defense in the underlying complaint against the plaintiff.

The plaintiff also maintained, and the trial judge agreed, that the defendants were estopped to deny any coverage because they had not defended the complaint against the defendants under a reservation of rights or filed a declaratory judgment action against the plaintiff for an adjudication of its duty under the policy. The defendants contend that the plaintiff has not established estoppel.

Our supreme court has explained estoppel in the context of an insurer's duty to defend:

> "The estoppel principle, properly stated, provides that an insurer which takes the position that a complaint potentially alleging coverage is not covered under a policy which includes a duty to defend may not simply refuse to defend the insured. Such insurer must defend the suit under a reservation of rights or seek a declaratory judgment that there is no coverage. If the insurer fails to do this, and is subsequently found to have wrongfully denied coverage, it is estopped from later raising policy defenses to coverage." *Waste Management, Inc. v. International Surplus Lines Insurance Co.* (1991), 144 Ill. 2d 178, 207-08, 579 N.E.2d 322.

■ In the case before us, the defendants did not defend the plaintiff under a reservation of rights, nor did they file a declaratory judgment action. (We disagree with the defendants' claim that demanding arbitration was equivalent to seeking a declaratory judgment.) Nonetheless, Illinois courts have held that an insurer is not estopped under these circumstances when the insured files the declaratory judgment action and the insurer files a motion for summary judgment in which it seeks an adjudication of rights under the policy:

> "Although the [insured] brought the declaratory judgment action, [the insurer] actively sought, through a motion for summary judgment, an adjudication of its rights and duties. That the [insured] brought the action is irrelevant; it is the fact of the declaratory judgment that is of legal import, and not the identity of the party initiating the proceeding." *Village of Melrose Park v. Nautilus Insurance Co.* (1991), 214 Ill. App. 3d 864, 867, 574 N.E.2d 198.

See also *Sears, Roebuck & Co. v. Seneca Insurance Co.* (1993), 254 Ill. App. 3d 686, 627 N.E.2d 173, and *Louis Marsch, Inc. v. Pekin Insurance Co.* (1985), 140 Ill. App. 3d 1079, 491 N.E.2d 432.

In this case, the defendant did file a motion for summary judgment and thus comes within the holdings of *Village of Melrose Park*

and the other cases cited. We therefore judge that the defendants are not estopped from raising other policy defenses. The two cases cited by the plaintiff, *Associated Indemnity Co. v. Insurance Co. of North America* (1979), 68 Ill. App. 3d 807, 386 N.E.2d 529, and *Aetna Casualty & Surety Co. v. Prestige Casualty Co.* (1990), 195 Ill. App. 3d 660, 553 N.E.2d 39, are factually distinguishable, but, more important, make no mention of the cases that we have relied upon. We conclude, therefore, that the defendants are not estopped from raising other policy defenses in further proceedings.

■ We further conclude that the judge did err in failing to exclude the plaintiff's request for attorney fees incurred in the filing of the complaint. All but one of the Illinois cases on the subject hold that, in the absence of vexatious behavior by the insurer, an insured may not recover attorney fees incurred in bringing a declaratory judgment action against the insurer to establish coverage. (See, *e.g., Society of Mount Carmel v. National Ben Franklin Insurance Co.* (1st Dist. 1994), 268 Ill. App. 3d 655; *Brotherhood Mutual Insurance Co. v. Roseth* (1st Dist. 1988), 177 Ill. App. 3d 443, 532 N.E.2d 354; *Tuell v. State Farm Fire & Casualty Co.* (2d Dist. 1985), 132 Ill. App. 3d 449, 477 N.E.2d 70; *Preferred Risk Mutual Insurance Co. v. United States Fidelity & Guaranty Co.* (1st Dist. 1979), 77 Ill. App. 3d 266, 395 N.E.2d 1180; *Reis v. Aetna Casualty & Surety Co.* (1st Dist. 1978), 69 Ill. App. 3d 777, 387 N.E.2d 700; *Brown Bag Co. v. Bituminous Casualty Corp.* (1st Dist. 1969), 117 Ill. App. 2d 287, 254 N.E.2d 577.) We decline to follow a fifth district case, *Trovillion v. United States Fidelity & Guaranty Co.* (1985), 130 Ill. App. 3d 694, 474 N.E.2d 953, in which the court awarded the insured attorney fees incurred in bringing a declaratory judgment action against its insurer. We believe that the *Trovillion* decision was based on an overly expansive reading of the supreme court's following statement in *Thornton v. Paul* (1978), 74 Ill. 2d 132, 145, 384 N.E.2d 335: "The measure of damages for [the] breach [of an insurer's duty to defend] is generally the amount of the judgment against the insured or of a reasonable settlement, plus any expenses incurred." We, therefore, reverse that part of the judgment that granted the plaintiff's request for attorney fees resulting from his declaratory judgment action.

Affirmed in part; reversed in part.

McNAMARA, P.J., and RAKOWSKI, J., concur.