HOME INSURANCE COMPANY, as the Successor in Interest to Home Indemnity Company, Plaintiff-Appellant, v. UNITED STATES FIDELITY AND GUARANTY COMPANY, Defendant-Appellee.

First District (2nd Division)    No. 1—99—2655

Opinion filed August 14, 2001.

Robert Marc Chemers and David S. Osborne, both of Pretzel & Stouffer, Chtrd., of Chicago, for appellant.

Robert L. Kiesler and Patti M. Deuel, both of Kiesler & Berman, of Chicago, for appellee.

JUSTICE McBRIDE delivered the opinion of the court:

This appeal arises from a declaratory judgment action filed by plaintiff-appellant, the Home Insurance Company (Home). In the trial court, Home, among other things, sought a declaration that defendant-appellee, United States Fidelity and Guaranty Company (USF&G), had a duty to defend Prestress Engineering Corporation (PEC) in a wrongful death action. The action, Pavesich v. Prestress (the underlying action), was filed in the circuit court of Cook County on June 21, 1993. USF&G moved to dismiss Home's declaratory judgment complaint. Based upon an agreed order, USF&G voluntarily withdrew its motion to dismiss and Home filed an amended declaratory judgment complaint. USF&G answered Home's amended complaint raising two affirmative defenses, the defense of late tender and a breach of the cooperation clause in the USF&G insurance policy. Home filed a motion to strike the affirmative defenses, which was denied by the trial court on June 10, 1998. On July 7, 1998, Home filed a second amended complaint for declaratory judgment, which was answered by USF&G accompanied by the same two affirmative defenses referred to above. Home moved for summary judgment on counts V and VI of its second amended complaint on December 21, 1998. USF&G responded by filing its own cross-motion for summary judgment which, by stipulation, sought only a declaration that USF&G had no duty to defend PEC. On June 28, 1999, the trial court found that USF&G had no duty to defend PEC in the underlying action. Thus, USF&G's cross-motion for summary judgment was granted and Home's motion for summary judgment was denied. Home appeals the orders entered by the trial court on June 10, 1998, and on June 28, 1999.

The threshold question to be decided on appeal is whether the trial court erred in granting USF&G's cross-motion for summary judgment and in denying Home's motion for summary judgment on the basis that USF&G had no duty to defend PEC in the underlying action. The other question posed by this appeal is whether the trial court properly denied Home's motion to strike USF&G's affirmative defenses.

•1 Our standard of review for summary judgment is *de novo*. *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113-14, 649 N.E.2d 1323 (1995). With this standard in place, we set out those facts that are relevant in disposing of this appeal.

In the underlying action, a fourth amended complaint (underlying complaint) was filed by Michele Pavesich, independent administrator of the estate of Gregory Pavesich, deceased, on March 11, 1997. The underlying complaint alleged that Mellon-Stuart Construction, Inc. (Mellon), was the general contractor for reconstructing the Bensenville Bridge, which is located over Interstate 294, pursuant to a contract with the Illinois State Toll Highway Authority. Mellon allegedly entered into an agreement with PEC whereby PEC would manufacture and deliver prestressed, precast concrete beams for use in reconstructing the Bensenville Bridge.

PEC allegedly contracted with A&M Cartage of Tinley Park, Inc. (A&M), "and/or" Tri Sons Transportation, Inc. (Tri Sons), where A&M "and/or" Tri Sons was to provide drivers with tractors to haul the concrete beams from the PEC plant to the Bensenville Bridge jobsite. It was further alleged that A&M "and/or" Tri Sons contracted with Transmedical, Inc. (Transmedical), where Transmedical was to supply the drivers who would haul the beams from PEC's facility to the bridge project.

Pavesich was a semi tractor-trailer operator employed by Transmedical. On May 21, 1992, he was killed when a 96,000-pound concrete beam he was hauling dislodged from its trailer moorings and crashed through the operator's cab, resulting in his death. The concrete beam, allegedly known as beam H-12, and the truck's trailer were both manufactured by PEC.

At the time of his death, Pavesich was alleged to have been in the scope of his employment when he was transporting the concrete beam from PEC's manufacturing plant to the bridge project. The underlying complaint specifically alleged that Pavesich was killed when the rear wheels of his truck ascended onto the curb at the intersection of Williams and Franklin, Franklin Park, Cook County, Illinois. Such activity caused the concrete beam to become dislodged and to crush the operator's cab, which resulted in his death. The underlying complaint named PEC, Tri Sons, and A&M as defendants in the underlying action. PEC was alleged to have been the supplier and the designer of the trailer used by Pavesich for hauling the concrete beam to the bridge project. A&M "and/or" Tri Sons was alleged to have provided the operator's cab or tractor which Pavesich was operating on the day he was killed.

Home underwrote an insurance policy, policy number BAF5664366, a/k/a BAF566436 (Home Policy), naming "E.M. Melahn Constr[u]ction Co." as its named insured. The Home Policy was effective for the period of April, 1, 1992, through April 1, 1993. A review of the record does not reveal that PEC is an insured or even referred to in the

Home Policy. However, the parties do not dispute the fact that PEC is an insured under the Home Policy. USF&G issued Tri Sons a truckers policy, policy number KTP176610 (USF&G Policy), effective for the period of April 14, 1992, to April 14, 1993.

In a letter dated, July 11, 1997, counsel for PEC in the underlying action notified USF&G of the lawsuit and tendered PEC's defense to USF&G. USF&G admitted in its answer to Home's interrogatories that it had been on notice of the underlying action since June 21, 1993, the date the underlying action was filed. The tender letter stated, among other things, that USF&G had a duty to defend PEC and that a conflict of interest existed between the positions of PEC and A&M and/or Tri Sons because the underlying complaint alleged liability against both PEC and Tri Sons for hauling the subject beam. Since USF&G was "precluded" from controlling PEC's defense, the letter further demanded that USF&G secure independent counsel for PEC due to the conflict of interest and also that USF&G provide indemnification for PEC in the underlying action. USF&G responded by denying coverage in a letter written by USF&G's counsel dated August 12, 1997. In the letter, coverage was denied by USF&G on several grounds. First, USF&G asserted that PEC was not an insured under its policy. Second, in the event PEC was an insured under the USF&G Policy, the allegations in the underlying complaint did not invoke coverage. Third, in the event coverage was invoked, its insurance was excess over the coverage provided PEC in the Home Policy. Fourth, PEC's failure to tender the suit for four years constituted a late tender which breached the cooperation clause in the USF&G Policy. Finally, counsel for USF&G stated that, in the event PEC disputed the denial of coverage, counsel was authorized to file a declaratory judgment action on behalf of USF&G so as to "judicially relieve it of any legal responsibility" to PEC in the underlying action.

In apparent anticipation of a denial letter from USF&G, Home filed a declaratory judgment action in the trial court naming USF&G and the Pavesich estate as defendants on August 1, 1997. In response, USF&G filed a motion to dismiss on the basis that Home lacked standing to seek a declaration as to USF&G's obligations to PEC because Home had not yet indemnified PEC in the underlying action. Home settled the underlying action via a settlement agreement that was executed on October 22, 1997. USF&G subsequently withdrew its motion to dismiss. By agreed order, Home was allowed leave to file an amended complaint for declaratory judgment and to dismiss the Pavesich estate as a defendant.

In the declaratory judgment action, Home filed a motion to strike USF&G's affirmative defenses which was denied by the trial court on

June 10, 1998. On June 28, 1999, the trial court found that USF&G had no duty to defend PEC in the underlying action. Home appeals the orders entered by the trial court on June 10, 1998, and on June 28, 1999.

We now turn to the question of whether USF&G had a duty to defend in the underlying action. As noted above, Tri Sons is the named insured under the USF&G Policy. PEC is not a named insured and is not identified as an additional insured. Thus, we must determine whether PEC is an additional insured based upon the coverage language in the USF&G Policy. The applicable policy language states, in relevant part:

> "1. WHO IS AN INSURED
> The following are 'insureds:'
> * * *
> C. The owner or anyone else from whom you *hire or borrow* a covered 'auto' that is a 'trailer' while the 'trailer' is connected to another covered 'auto' that is a power unit; or if not connected:
> (1) is being used exclusively in your business as a 'trucker;' and
> (2) is being used pursuant to operating rights granted to you by a public authority." (Emphasis added.)

The term "auto" is defined in the USF&G Policy as "a land motor vehicle, trailer or semitrailer designed for travel on public roads but does not include 'mobile equipment.' " Based on the above language, the specific question we must determine is whether Tri Sons hired or borrowed the trailer from PEC that was involved in Pavesich's death. The terms "hire" and "borrow" are not defined in the USF&G Policy and are subject to more than one interpretation. Thus, we must construe these terms in favor of the insured and against the insurer that drafted the policy. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 108-09, 607 N.E.2d 1204 (1992).

●2 It is well-settled law in Illinois:

> "In determining whether the insurer owes a duty to the insured to defend an action brought against him, it is the general rule that the allegations of the complaint determine the duty. If the complaint alleges facts within the coverage of the policy or potentially within the coverage of the policy the duty to defend has been established. [Citations.]" *Maryland Casualty Co. v. Peppers*, 64 Ill. 2d 187, 193-94, 355 N.E.2d 24 (1976).

In addition, "[r]efusal to defend is unjustifiable unless it is clear from the face of the underlying complaint that the facts alleged do not fall potentially within the policy's coverage." *Outboard Marine*, 154 Ill. 2d at 108. "The allegations in the underlying complaint must be liberally construed in favor of the insured." *Outboard Marine*, 154 Ill. 2d at 125.

In conformity with the above standards, we now examine the allegations relied upon by the parties in the underlying complaint,[1] in relevant part:

"16. Prior to May 21, 1992, Mellon entered into a contract with PEC which called for PEC to manufacture and to deliver prestressed precast concrete beams for use in the reconstruction of the Bensenville Bridge.

17. Prior to May 21, 1992, PEC entered into an agreement with A&M and/or Tri-Sons under which A&M and/or Tri-Sons were to provide drivers with tractors to haul the concrete beams from the Prestress plant to the Bensenville Bridge jobsite.

18. Prior to May 21, 1992, A&M and/or Tri-Sons entered into an agreement with Transmedical under which Transmedical was to supply the drivers who would haul the beams from PEC's facility to the Bensenville Bridge jobsite.

19. Plaintiff's decedent, Gregory Pavesich[,] was a truck driver employed by Transmedical who periodically hauled beams from the Prestress facility to the Bensenville Bridge jobsite.

20. A&M and/or Tri-Sons supplied Transmedical with the tractor which Gregory Pavesich was operating on May 21, 1992.

21. PEC supplied pole trailer #532 which Gregory Pavesich was pulling on May 21, 1992.

22. Prior to May 21, 1992, PEC designed trailer #532 for use in the delivery of its precast, prestressed bridge beams.

23. Prior to May 21, 1992, PEC manufactured trailer #532 for use in the delivery of its precast, prestressed bridge beams.

24. Prior to May 21, 1992, PEC assembled trailer #532 for use in the delivery of its precast, prestressed bridge beams.

* * *

27. Prior to May 21, 1992, PEC devised procedures for loading and securing of its precast, prestressed concrete beams onto its pole trailers.

28. With regard to the loading and securing of all beams to the Bensenville Bridge project, PEC determined and devised the manner and method of loading its precast, prestressed concrete beams onto its pole trailers.

29. Employees of PEC performed the actual loading of beam H-12 onto trailer #532 on May 21, 1992.

30. Employees of PEC assisted Gregory Pavesich with the task of slinging chains over beam H-12 during the process of securing the beam to trailer #532 on May 21, 1992.

---

[1]As noted by Home, paragraphs 1 through 35 in each count of the underlying complaint are identical. Thus, references to these paragraphs will also apply to counts I and IV, which concern the allegations against PEC, A&M, and Tri-Sons in the underlying complaint.

\*\*\*

32. Defendant A&M and/or Tri-Sons supplied the chains and chain binder which Gregory Pavesich used to secure beam H-12 to trailer #532 on May 21, 1992.

\* \* \*

35. On May 21, plaintiff's decedent, Gregory Pavesich, was killed when a beam (identified as beam H-12) manufactured by PEC fell from the trailer supplied by PEC onto the tractor supplied by A&M and/or Tri-Sons which was being operated by Gregory Pavesich in the ordinary course and scope of his employment with Transmedical en route to the Bensenville Bridge jobsite, at/or near the intersection of Williams and Franklin, Franklin Park, Cook County, Illinois."

In count IV, the underlying complaint alleges:

"37. Notwithstanding the aforesaid duty [to exercise ordinary care], on and before May 21, 1992, defendants [A&M and Tri Sons], by and through its agents and/or employees, was negligent in on one or more of the following respects, by:

\* \* \*

b) failing to supply Gregory Pavesich with a trailer that was appropriate for hauling precast, prestressed concrete beams like beam H-12; or

\*\*\*

d) allowing PEC to dictate the method of loading and securing of precast, prestressed concrete beams, including beam H-12 even though defendant knew, or in the exercise of ordinary care, should have known, that PEC did not employ any engineers \*\*\*."

Based on the above allegations, Home asserts that Tri Sons at least potentially hired or borrowed the PEC trailer. Thus, according to Home, since it cannot be categorically ruled out that Tri Sons did not hire or borrow PEC's trailer, USF&G's duty to defend is triggered. In support of its argument, Home relies on the following cases from other jurisdictions, many of which involved trucking accidents: *Farmland Dairies v. New Jersey Property Liability Insurance Guaranty Ass'n*, 237 N.J. Super. 578, 581, 568 A.2d 579, 581 (1990); *Mission Insurance Co. v. Hartford Insurance Co.*, 155 Cal. App. 3d 1199, 1204, 1214, 202 Cal. Rptr. 635, 637, 644 (1984); *Nationwide Mutual Insurance Co. v. Great West Casualty Co.*, 102 F.3d 965, 967-68 (8th Cir. 1996); *Atlantic Casualty & Fire Insurance Co. v. National American Insurance Co.*, 915 F. Supp. 1218, 1224 (M.D. Fla. 1996); and *Travelers Indemnity Co. v. Swearinger*, 169 Cal. App. 3d 779, 214 Cal. Rptr. 383 (1985).

Home relies upon the above authority because, "truck accident cases often involve complex sets of lessor/lessee, ICC liability, and tort

liability issues." Home further claims that the term "hire or borrow" as used in the USF&G Policy is meant to include all arrangements between the owner and operator for the handling of a trailer and for the handling of a tractor. According to Home, if money changes hands, the trailer is "hired"; if no money is exchanged, the trailer is "borrowed." Thus, Home concludes that trailer owners are included as insureds for liability purposes under the USF&G Policy.

We are not persuaded by the authority relied upon by Home above to resolve the first question on appeal. Although a review of the cases reveals nearly identical policy language to this case in some instances (*Farmland Dairies*, 237 N.J. Super. at 582, 568 A.2d at 582; *Nationwide Mutual*, 102 F.3d at 968; *Atlantic Casualty*, 915 F. Supp. at 1221), the facts and contractual relationships between the parties are not identical to those in this case. In the interest of avoiding a protracted discussion on these cases from foreign jurisdictions, we adopt the definition of the term "borrow" as articulated by the appellate court in this state.

In *Brile v. Estate of Brile*, 296 Ill. App. 3d 661, 666-67, 695 N.E.2d 1309 (1998), plaintiff's husband, Christopher Brile, deceased, began working for Photocomm, Inc., in Downers Grove, Illinois. Some time thereafter, Photocomm decided to close its Downers Grove office, yet it wanted to retain the employment of Christopher Brile because he was a valuable employee. As a result, Christopher was offered a promotion by Photocomm that required the relocation of his family to Denver, Colorado. As part of the relocation plan, it was decided by Photocomm and Christopher that he would rent a truck for the purpose of moving his personal items in addition to transporting Photocomm's customer files and other office materials from Illinois to Colorado. Photocomm wished to have its customer files, material, and equipment transported by Christopher instead of hiring a common carrier due to the sensitive nature of the customer files as well as the increased shipping expenses. Thus, Photocomm agreed to reimburse Christopher for the truck rental because of the "dual purpose" of moving Christopher's personal items as well as the company's customer files.

Christopher subsequently entered into a rental agreement with a truck rental company that he paid for with a personal credit card. Photocomm's name was not identified on the rental agreement. Christopher left for Colorado accompanied by his son Matthew, deceased. He did not inform Photocomm that Matthew would accompany him or that Matthew would participate in any driving during the trip. While Matthew was driving, the truck was involved in an accident that killed both Christopher and Matthew.

Plaintiff, Marion Brile, Christopher's wife, filed a wrongful death

action against her son, Matthew, resulting from the accident that occurred while Matthew was driving. Thereafter, the special administrator of Matthew's estate filed a declaratory judgment action against Federal Insurance Company, Photocomm's insurer, seeking a declaration that Federal's policy, issued to Christopher's employer, afforded coverage to Matthew. The trial court granted summary judgment in favor of Federal on the basis that Matthew was not an insured under the Federal policy.

The Federal policy provided that anyone is an insured who "uses, with Photocomm's permission, a covered auto owned, hired, or borrowed by Photocomm." (Emphasis omitted.) *Brile*, 296 Ill. App. 3d at 666. Among other things, Federal argued that Photocomm did not own, hire, or borrow the vehicle Matthew was using at the time of the accident. The court, citing Black's Law Dictionary, defined borrow as, " '[t]o solicit and receive from another any article of property, money or thing of value with the intention and promise to repay or return it or its equivalent.' [Citation.]" *Brile*, 296 Ill. App. 3d at 666-67.

As USF&G correctly notes in its brief, the court in *Brile* found that the named insured, Photocomm, had received a thing of value in that it obtained a method for transporting its office supplies and customer files in a cheaper and more convenient manner through the use of its employee. Because the named insured received a thing of value, the court found that the insured had borrowed the vehicle under the liability policy at issue. *Brile*, 296 Ill. App. 3d at 667.

In this case, although there are no allegations that Tri Sons hired or borrowed PEC's trailer, it is clearly alleged that PEC's trailer was attached to A&M and/or Tri Son's tractor at the time of the occurrence. Applying a similar analysis, we conclude that Tri Sons received a "thing of value" out of its agreement with PEC much like the value that Photocomm received from Christopher in *Brile*. While the complaint does not specifically allege that Tri Sons received a thing of value, it alleges that there was an agreement between PEC and Tri Sons, whereby Tri Sons was charged with providing drivers and tractors in order to haul the concrete beams to the Bensenville Bridge jobsite. While the agreement is not part of the record, the underlying complaint alleges that PEC supplied the trailer to Tri Sons. It also alleges that Tri Sons' tractor was attached to PEC's trailer to haul the concrete beam.

●3 At the very least, therefore, it can be concluded from the allegations in the complaint that Tri Sons used PEC's trailer to haul the concrete beam to the jobsite. It is reasonable to conclude that such use by Tri Sons amounted to a "hiring" or "borrowing" under the terms in USF&G Policy. While it is unclear whether a hiring or borrowing occurred in this case, we agree with Home that the term "hire or bor-

row" in the USF&G Policy is meant to include all arrangements for the handling of a trailer between the owner of the trailer and the owner of the tractor. As noted by Home, the court in *Farmland Dairies*, cited above, did interpret virtually identical policy language to mean that trailer owners are considered insureds for liability purposes. *Farmland Dairies*, 237 N.J. Super. at 581, 568 A.2d at 581. Because the USF&G Policy does not define "hire or borrow," we determine that Tri Sons' use of the trailer fits within the policy term. As noted above in *Outboard Marine*, policy terms that could be subject to more than one interpretation are construed against the insurer and in favor of the insured. *Outboard Marine*, 154 Ill. 2d at 108-09. The allegations in the underlying complaint support the proposition that Tri Sons used PEC's trailer and unquestionably received a thing of value as a result of such "use" whether it was hired or borrowed. Therefore, we find that Tri Sons, at minimum, could have "borrowed" PEC's trailer under the USF&G Policy, thereby potentially invoking coverage.

USF&G claims that Tri Sons could not have "benefitted" or did not receive a thing of value because PEC hired Tri Sons to fulfill its obligations to Mellon to deliver the beams. Thus, according to USF&G, Tri Sons did not benefit because the contractual relationship was between PEC and Mellon. We disagree. As pointed out above, the underlying complaint alleges that Tri Sons, as a provider of tractors and drivers, was the hauler of PEC's trailer which carried the concrete beams. As a result, Tri Sons received a thing of value from its agreement with PEC. We determine, therefore, that Tri Sons borrowed PEC's trailer under the USF&G Policy.

We further conclude that USF&G had a duty to defend Tri Sons in the underlying lawsuit and that the trial court erred in granting its cross-motion for summary judgment. The parties do not dispute that the proper methodology for determining insurance coverage is by comparing the allegations in the underlying complaint to the policy language at issue. Our supreme court has stated:

> "As a general rule, the duty of an insurer to defend an action brought against the insured is to be determined solely from the allegations of the complaint. If the complaint alleges facts within or potentially within policy coverage, the insurer is obliged to defend even if the allegations are groundless, false, or fraudulent. [Citations.] In addition, in Illinois the duty is not annulled by the knowledge of the insurer that the allegations are untrue." *Thornton v. Paul*, 74 Ill. 2d 132, 145, 384 N.E.2d 335 (1978), *rev'd on other grounds*, *American Family Mutual Insurance Co. v. Savickas*, 193 Ill. 2d 378, 793 N.E.2d 445 (2000).

Based on the allegations in the underlying complaint and the applicable USF&G Policy language, we conclude that a potential for

coverage exists. The trial court's order of June 10, 1998, is accordingly reversed.

Because we conclude that USF&G had a duty to defend, we now address whether Home was entitled to summary judgment as a matter of law on estoppel, subrogation, and damages under section 155 of the Insurance Code (215 ILCS 5/155 (West 1996)). The trial court never considered these questions because it granted USF&G's cross-motion for summary judgment on the duty to defend.

Relying on *Cincinnati Cos. v. West American Insurance Co.*, 183 Ill. 2d 317, 328, 701 N.E.2d 499 (1998), Home claims that USF&G's obligation to defend was triggered on June 21, 1993, when it had actual notice of the underlying action. Additionally, because USF&G failed to promptly file a declaratory judgment action or to defend under a reservation of rights at the time it had actual notice of the underlying action, Home argues that it is now estopped from raising policy defenses to coverage. *Employers Insurance of Wausau v. Ehlco Liquidating Trust*, 186 Ill. 2d 127, 150-51, 708 N.E.2d 1122 (1999). Thus, Home contends that summary judgment should have been granted on the questions of estoppel, subrogation, and section 155 damages as a result of USF&G's breach of the duty to defend which Home claims arose in 1993.

In response, USF&G contends that the actual notice rule announced in *Cincinnati* does not apply because in that case there was no question the insurer knew a cause of action had been filed against its additional insured. *Cincinnati*, 183 Ill. 2d at 330. In this case, USF&G claims that, while it knew of the underlying litigation because Tri Sons was a named defendant and was a named insured under its policy, it did not know that PEC considered itself an insured under that same USF&G Policy until 1997. USF&G also argues that because PEC was not named as an insured or listed as an additional insured on the USF&G Policy it did not know that the underlying complaint fell within or potentially within coverage as to PEC. USF&G also claims that, once notified of PEC's claim, it properly denied coverage based on its determination that PEC was not an insured. Therefore, USF&G argues *Cincinnati* is distinguishable because the insured was named as an additional insured in the policy and no question concerning coverage arose in that case. Under the instant facts, USF&G also argues that it did not have "actual notice" of the lawsuit until July 11, 1997, when it first received the tender letter from PEC's counsel.

•4 Before beginning our analysis of whether and when USF&G had actual notice of the underlying action, we refer to the language of *Cincinnati* in which the supreme court stated: "[I]n order to have actual notice sufficient to locate and defend a suit, the insurer must know both that a cause of action has been filed [against its insured]

and that the complaint falls within or potentially within the scope of the coverage of one of its policies." *Cincinnati*, 183 Ill. 2d at 329-30. Therefore, in order to find that USF&G had actual notice, both prongs of the rule must be met.

The facts in *Cincinnati* disclosed that plaintiff, an injured construction worker, brought suit against two jobsite contractors, Baird Land Surveyors and B&D Home Repair and Builders. Baird was named an additional insured on a policy underwritten by Cincinnati Companies and B&D was insured by West American Insurance Company. Upon receiving service in connection with the lawsuit, Baird, tendered the defense to its own insurance company, which tendered the defense to Cincinnati. B&D tendered its defense to West American. Thus, both insurers had notice of the underlying litigation shortly after their respective insureds were served with process.

During discovery in the underlying action, the plaintiff served B&D with interrogatories which requested that B&D list the insured under each policy that may have provided plaintiff coverage. B&D responded that it was covered by the West American Policy and that only B&D was an insured under that policy. On the eve of the third trial date, however, B&D's counsel disclosed to Baird that Baird was also listed as an additional insured on the West American Policy issued to B&D. As a result, Baird tendered its defense to West American, which rejected the tender. *Cincinnati*, 183 Ill. 2d at 319-20.

Cincinnati subsequently filed a declaratory judgment action against West American seeking a declaration that West American was a primary insurer for Baird in the underlying litigation. Cincinnati further sought a declaration that West American was liable for the amount that Cincinnati had paid on behalf of Baird to settle the underlying suit, as well as attorney fees and costs incurred by Cincinnati on behalf of Baird in defending the case. The trial court found that the answers to the interrogatories provided to Baird made no reference to the West American policy and prevented Baird from making a reasonable judgment as to tender. Therefore, the lack of tender could not be attributed to Baird but should have been attributed to the attorney for B&D. *Cincinnati*, 183 Ill. 2d at 320. The trial court then held West American liable for an equitable share of the settlement and attorney fees incurred after the date West American had notice of the suit, which was shortly after the lawsuit had been filed. *Cincinnati*, 183 Ill. 2d at 321.

Before the appellate court, West American argued that an insurer has no obligation to defend an insured until the insured actually tenders its defense to the insurer, that is, requests the insurer's assistance in defending the underlying suit. Rejecting that position, the appellate court affirmed the trial court's decision that an insurer's duty

to defend claims potentially within the terms of a policy is triggered when the insured has actual notice of the lawsuit, regardless of whether there has been an actual tender of the defense by the insured. *Cincinnati*, 183 Ill. 2d at 321.

On appeal, the supreme court resolved whether an insurer's duty to defend its insured arises when the insurer receives actual notice of a lawsuit against its insured or only upon tender of the defense to the insurer. Before answering that question, the supreme court reviewed several cases, including *Federated Mutual Insurance Co. v. State Farm Mutual Automobile Insurance Co.*, 282 Ill. App. 3d 716, 668 N.E.2d 627 (1996).

In that case, the plaintiff, Federated, issued an insurance policy to a Volkswagen dealer that covered a fleet of automobiles. An employee of the dealer borrowed one of those vehicles to use for the weekend. During that time, the employee attended a party with four friends, one of whom was Kathleen Gallagher. Gallagher was driving the vehicle home from the party when she struck the rear of a stopped vehicle. All four of the passengers in the vehicle suffered injuries and filed suit against Gallagher.

After being served with process, Gallagher contacted her insurer, defendant State Farm, on November 22, 1993. On December 14, 1993, State Farm sent Federated a tender letter notifying it of the suit and claiming that Federated was the primary liability carrier for Gallagher. On March 3, 1994, Federated filed a declaratory judgment action on the basis that it had no duty to defend Gallagher because she did not tender her defense directly to Federated. *Federated*, 282 Ill. App. 3d at 719. Federated, however, had actual notice of the lawsuit against Gallagher less than one month after Gallagher had been served.

*Federated* essentially involved the same question the court faced in *Cincinnati*, that is, whether an insurer's duty to defend is triggered by actual notice of a lawsuit involving its insured or by the insured's tender of defense of that lawsuit to the insurance company. *Federated* held that actual notice triggers the duty to defend except where the insured has knowingly decided against the insurer's involvement or where prejudice to the insurer occurs. *Federated*, 282 Ill. App. 3d at 727.

After reviewing the decision in *Federated*, the supreme court in *Cincinnati* held:

> "[W]here the insured has not knowingly decided against an insurer's involvement, the insurer's duty to defend is triggered by actual notice of the underlying suit, regardless of the level of the insured's sophistication. *** We note that in order to have actual

notice sufficient to locate and defend a suit, the insurer must know both that a cause of action has been filed and that the complaint falls within or potentially within the scope of the coverage of one of its policies." *Cincinnati*, 183 Ill. 2d at 329-30.

Thereafter, the supreme court concluded that West American's duty to defend was triggered by actual notice of the underlying suit. The supreme court found that West American had actual notice because it was aware of the underlying lawsuit almost from its inception and because Baird, a named defendant, was named an additional insured under its policy. *Cincinnati*, 183 Ill. 2d at 328, 330.

We find that the facts in both *Cincinnati* and *Federated* are distinguishable from the instant case. In *Cincinnati*, it was clear that West American had actual notice of the lawsuit against Baird shortly after service of process for two reasons. First, B&D tendered its defense to West American shortly after receiving notice of the law suit which included Baird as a defendant. Second, Baird was listed as an additional insured on the West American policy.

In this case, PEC was neither a named insured nor listed as an additional insured on the USF&G Policy. In addition, USF&G did not receive a tender letter from PEC claiming coverage until four years after the commencement of the underlying litigation. As a result, we find the facts in this case are not similar to those in *Cincinnati*.

In *Federated*, the insured, Gallagher, notified her own insurance carrier of the lawsuit shortly after being served with a summons and complaint. Less than one month later, Gallagher's carrier, State Farm, notified Federated via letter that it considered Federated to be the primary liability carrier for Gallagher and that it was tendering the defense of the suit to Federated. Thus, Federated had actual knowledge of the suit against Gallagher almost immediately. While Gallagher was not a named insured on the Federated policy, Federated was put on notice at the outset of the litigation that Gallagher and State Farm were requesting coverage.

●5 In this case, however, as pointed out above, PEC did not tender the defense to USF&G until more than four years after the underlying complaint had been filed. Further, while Home claims that USF&G admitted actual knowledge of the lawsuit on June 21, 1993, the record reveals that USF&G only admitted to being advised of the underlying action and that PEC was a defendant on that date. Unlike *Cincinnati*, PEC was not a named insured or listed as an additional insured on the USF&G Policy. USF&G claims that it did not have "actual notice" of the underlying action when it was first filed because PEC was not named or listed as an additional insured on the USF&G Policy and because it did not know the complaint fell within or potentially within

coverage of the policy. According to USF&G, even if there was a duty to defend, which it contests, a question of fact still exists as to when the duty to defend arose. We agree that a material question of fact exists as to whether USF&G had actual notice of the underlying litigation as it pertained to PEC at the time the lawsuit was filed in 1993 or later in 1997 when it received the actual tender letter.

As a result, we also conclude that questions of fact exist as to whether estoppel, subrogation, and section 155 damages apply in this case. These questions can be resolved only after the trial court determines when actual notice occurred. If Home can establish that USF&G had actual notice as it pertained to PEC in 1993, the estoppel doctrine may apply on the ground that USF&G breached its duty to defend.

On the other hand, if the actual notice occurred in 1997, the estoppel doctrine may not apply based on USF&G's policy defenses. This is so because:

"Application of the estoppel doctrine is not appropriate if the insurer had no duty to defend, or if the insurer's duty to defend was not properly triggered. These circumstances include *where the insurer was given no opportunity to defend*; where there was no insurance policy in existence; and where, when the policy and the complaint are compared, there clearly was no coverage or potential for coverage. [Citations.]" (Emphasis added.) *Ehlco*, 186 Ill. 2d at 151.

The facts in this case show that the underlying action was initiated in 1993, but PEC relied on Home's defense for four years before tendering to USF&G in 1997. Moreover, PEC's tender occurred after the completion of discovery in the underlying action and on the eve of trial. When PEC did tender its defense to USF&G on July 11, 1997, USF&G responded within approximately 30 days, denying coverage, and offered to file a declaratory judgment suit concerning its responsibility to defend the underlying action. Allowing USF&G less than 30 days to respond to its tender letter, Home filed its own declaratory judgment action in the circuit court on August 1, 1997. Further, without any involvement from USF&G, Home settled the underlying action on October 22, 1997. Based on these facts, USF&G claims that it was given no opportunity to defend and that it should not be estopped from asserting its policy defenses. Whether the doctrine of estoppel applies on the basis that USF&G had no opportunity to defend is a question of fact to be resolved by the trial court.

On the other hand, we also note that an insurer may not refuse to defend its insured once the duty to defend is triggered.

"Rather, the insurer has two options: (1) defend the suit under a

reservation of rights or (2) seek a declaratory judgment that there is no coverage. If the insurer fails to take either of these steps and is later found to have wrongfully denied coverage, the insurer is estopped from raising policy defenses to coverage." *Ehlco*, 186 Ill. 2d at 150-51.

Depending upon a full presentation of the facts, the estoppel doctrine may be applied. The record does not reveal when PEC became aware of its insured status under the USF&G Policy. At the very latest, we know that PEC considered itself an insured under the USF&G Policy around July 11, 1997. On that date, it tendered its defense to USF&G, which denied coverage on August 12, 1997.

Home then filed a declaratory judgment action seeking coverage for PEC on August 1, 1997. In response, on September 5, 1997, USF&G filed a motion to dismiss, in lieu of an answer, asserting that Home had no standing to seek a declaratory judgment as to USF&G's coverage obligations to PEC because Home had not yet indemnified PEC in the underlying action. Home then settled the underlying litigation on October 22, 1997. In response, USF&G withdrew its motion to dismiss and filed a cross-motion for summary judgment as to Home's amended declaratory judgment complaint which sought coverage for PEC. USF&G's cross-motion for summary judgement was filed 18 months after PEC tendered its defense and 17 months after Home filed the original declaratory judgment action.

A full presentation of all the facts may reveal that USF&G wrongfully denied coverage and that the doctrine of estoppel is applicable. We conclude that whether estoppel should apply is a material question of fact to be resolved by the trial court. This question can only be decided after the trial court determines when USF&G had actual notice of the underlying action. At that point, the trial court can reach the questions of estoppel, subrogation, and section 155 damages. 215 ILCS 5/155 (West 1996).

In conclusion, because material questions of fact remain, we cannot say as a matter of law that USF&G had "actual notice" under *Cincinnati* of the lawsuit on June 21, 1993, or sometime later. We also cannot say, as a matter of law, whether estoppel, subrogation or section 155 damages apply. 215 ILCS 5/155 (West 1996). Accordingly, we remand the case to the trial court for resolution of these questions.

Finally, Home claims the supreme court intended that the *Cincinnati* actual notice rule apply retroactively based upon its later decision in *Ehlco*. *Ehlco*, 186 Ill. 2d at 143. The supreme court in *Ehlco* remanded the case to the trial court for a determination of when actual notice had been received. *Ehlco*, 186 Ill. 2d at 143-44. We observe that, in *Ehlco*, the court applied the actual notice rule based

on its decision in *Cincinnati* despite the fact that *Cincinnati* was decided after the coverage disputes had occurred in that case. *Ehlco*, 186 Ill. 2d at 143-44. As a result, we agree with Home that the actual notice rule can be applied retroactively under such circumstances.

We also find that the trial court properly denied Home's motion to strike USF&G's affirmative defenses because factual questions concerning these defenses remain unresolved.

The trial court's ruling on the duty to defend is reversed and the ruling on Home's motion to strike USF&G's affirmative defenses is affirmed. The case is remanded to the trial court for the reasons set forth above.

Affirmed in part and reversed in part; cause remanded with directions.

CAHILL, P.J., and GORDON, J., concur.