In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 12-2275 & 12-2341

CAROLINA CASUALTY INSURANCE COMPANY,

*Plaintiff-Appellant,*

*Cross-Appellee,*

*v.*

MERGE HEALTHCARE SOLUTIONS INC.,

*Defendant-Appellee,*

*Cross-Appellant.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 11 C 3844—**Suzanne B. Conlon**, *Judge.*

ARGUED OCTOBER 26, 2012—DECIDED JULY 16, 2013

Before EASTERBROOK, *Chief Judge*, and CUDAHY and
TINDER, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Amicas, Inc., agreed to
merge with Thoma Bravo, LLC, in a transaction that
valued each Amicas share at $5.35. Some of its share-
holders sued in a state court of Massachusetts, contesting

the adequacy of the proxy statement used to seek their approval for the transaction. After a preliminary injunction stopped the vote on the merger, the suit was settled when Merge Healthcare, Inc., made a tender offer of $6.05 a share, which Amicas's board recommended that investors accept. Amicas's shareholders gained $26 million.

The lawyers who filed the suit sought attorneys' fees based on the difference between the two suitors' bids. Carolina Casualty Insurance had issued a policy covering as part of the insured "loss" not only what Amicas and its directors pay their own lawyers in litigation but also what Amicas must pay to its adversaries' lawyers. The state court awarded plaintiffs' counsel $3,150,000, derived from a lodestar of $630,000 (1,400 hours at $450 per hour) times five. The multiplier represented an adjustment for both the risk of nonpayment and what the judge called "an exceptionally favorable result for Amicas' shareholders." *In re Amicas, Inc. Shareholder Litigation*, 2010 Mass. Super. LEXIS 325 at *10 (Mass. Super. Dec. 6, 2010).

Amicas appealed to the Massachusetts Appeals Court, contending that the award is excessive. (By then Amicas had been renamed Merge Healthcare Solutions Inc.; to simplify this opinion we call it Amicas consistently.) Carolina Casualty contends in this suit under the diversity jurisdiction that its policy's coverage is limited to the $630,000 lodestar. The district judge held otherwise, however, and concluded that Carolina Casualty owes the entire $3.150 million, plus whatever Amicas

paid its own lawyers—though the court rejected Amicas's demand for damages on the theory that Carolina Casualty had displayed bad faith or vexatiously failed to pay. 2012 U.S. Dist. LEXIS 4772 (N.D. Ill. Jan. 13, 2012) (coverage and bad-faith rulings); 2012 U.S. Dist. LEXIS 60765 (N.D. Ill. Apr. 30, 2012) (vexatious-failure ruling). Both sides have appealed.

After the appeals were argued in this court, the Massachusetts appeal on the fees issue was settled. Carolina Casualty paid the plaintiffs' lawyers in the proxy suit a sum that cannot be affected by the results of the federal litigation. But that does not make our case moot, because Amicas seeks to recover its own litigation expenses (in the state appeal and in these federal proceedings), which are "loss" under the policy, plus damages.

Carolina Casualty invokes this exclusion in its policy: "Loss shall not include civil or criminal fines or penalties imposed by law, punitive or exemplary damages, the multiplied portion of multiplied damages, taxes, any amount for which the Insureds are not financially liable or which are without legal recourse to the Insureds, or matters which may be deemed uninsurable under the law pursuant to which this Policy shall be construed." It believes that the phrase "multiplied portion of multiplied damages" applies to the state judge's use of a multiplier in calculating attorneys' fees. Carolina Casualty concedes that $630,000, the lodestar, counts as "loss" under the policy but maintains that the remaining $2.52 million is the "multiplied portion of multiplied

damages". The parties do not contest the district judge's conclusion that Illinois law controls—a conclusion influenced by the district judge's belief that Illinois and Massachusetts law are identical with respect to the issues at stake.

The state judge used a multiplier, but an award of attorneys' fees differs from "damages." The underlying litigation rested in part on Massachusetts securities law and in part on §14 of the Securities Exchange Act of 1934, 15 U.S.C. §78n. Neither Massachusetts nor federal securities law defines attorneys' fees as damages; in both state and federal systems fees (when shifted at all) are treated as part of costs. That's why awards are appealable separately from the merits. See *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196 (1988). That's also why fees for time spent after a suit begins do not count toward the amount in controversy required for suits under the diversity jurisdiction. See *Gardynski-Leschuck v. Ford Motor Co.*, 142 F.3d 955 (7th Cir. 1998). An insurance policy could give "damages" a more comprehensive meaning. Some policies define "damages" broadly. See, e.g., *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 117 (1992) (expense of complying with an injunction treated as damages). But nothing in Carolina Casualty's policy defines the word "damages" broadly enough to include attorneys' fees. Indeed, the very clause on which Carolina Casualty relies uses "loss" and "damages" as distinct concepts.

An insurer might omit a definition of "damages" if state insurance law supplied one automatically. We therefore

looked for state decisions asking whether the phrase "multiplied portion of multiplied damages" in insurance policies includes attorneys' fees. We could not find a single decision from a court of any state, or for that matter any federal court. The few decisions, state or federal, that do interpret this phrase arise from disputes about the coverage of treble damages under antitrust or antifraud legislation. Courts unsurprisingly say that the policies cover single damages but not the sum after trebling. See, e.g., *Foster v. D.B.S. Collection Agency,* 2008 U.S. Dist. LEXIS 22264 (S.D. Ohio Mar. 20, 2008).

The context of the phrase "multiplied portion of multiplied damages" tells us that treble damages and the like are the target. Here is the full exclusion again: "Loss shall not include civil or criminal fines or penalties imposed by law, punitive or exemplary damages, the multiplied portion of multiplied damages, taxes, any amount for which the Insureds are not financially liable or which are without legal recourse to the Insureds, or matters which may be deemed uninsurable under the law pursuant to which this Policy shall be construed." This list, which includes punitive damages and criminal penalties, covers a category of losses that insurers regularly exclude to curtail moral hazard—the fact that insurance induces the insured to take extra risks. The insured hopes to profit from risky conduct and to shift to the insurer any loss if the risk comes to pass. Moral hazard drives up the cost of insurance and can make some kinds of coverage unavailable, because a price high enough to make the policy profitable would lead

potential clients that plan to operate safely to shun the coverage.

Adversaries' attorneys' fees in commercial litigation are not remotely like punitive damages, trebled damages, or criminal fines and penalties. A multiplier of hourly rates provides compensation for the attorney's risk. That does not entail moral hazard, which is risk-taking *by the insured*, induced by the insurance. A risk adjustment for legal fees, by contrast, makes up for the fact that in other suits defendants will prevail and lawyers will get nothing.

Plaintiffs' lawyers in the proxy litigation asked the state court to set their compensation as a percentage of the investors' gains. This is often done in suits that generate a fund. The plaintiff in a tort suit may agree to pay counsel a third of any recovery. This fee often substantially exceeds the lawyer's hourly rate times the number of hours expended, and over the run of many cases it must do so to make up for the times counsel will sue, lose, and go unpaid. But we doubt that Carolina Casualty would call a contingent fee calculated at a third of the plaintiff's recovery the "multiplied portion of multiplied damages".

The proposal in this suit was 19% of the $26 million benefit, or $4,940,000. The state judge thought this excessive. The judge could have reached $3,150,000 by reckoning it as 12.11% of the shareholders' gain, and we assume that Carolina Casualty then would not be relying on the exclusion. Why should it matter that the judge got to the final award using the lodestar method

rather than the percentage-of-benefit method? Carolina Casualty does not have a good answer. It would not be helpful, as Carolina Casualty favored in the district court, to obtain expert opinion about custom and usage in the industry; there isn't any relevant custom in classifying fee awards under a policy written like this one.

Now to the cross-appeal. Amicas contends that Carolina Casualty acted in bad faith by contending that its policy covers only 20% of the award. But the insurer did just what Illinois prefers: it filed a declaratory-judgment action to resolve the meaning of the policy. It also paid Amicas's costs of separate counsel, though under a reservation of rights. Amicas observes that, before the state judge acted, Carolina Casualty promised to indemnify Amicas for any fees awarded to plaintiffs' counsel. Reneging on that promise is evidence of bad faith, Amicas insists. Yet the insurer did not renege; the letter referred to the policy as a potential source of limitation. Until the state judge issued his opinion, Carolina Casualty could not know that the court would use a multiplied-lodestar method that at least arguably activated the policy's exclusion. The insurer behaved responsibly after the state judge replaced counsel's preference (an award based on a percentage of the gain) with the court's own (the lodestar with multiplier). Amicas contends that Carolina Casualty could be liable for negotiating to settle with the plaintiffs' lawyers in the Massachusetts case while arguing that Amicas would have to pay 80%, but that possibility

evaporated when the final settlement provided that all of the money would come from Carolina Casualty.

AFFIRMED